## THE STATE OF KANSAS V. JOHN E. McCARTY.

1. HOMICIDE — *Declarations of Deceased — Res Gestœ — Evidence.* On a prosecution for murder, declarations of the deceased prior to the fatal encounter are inadmissible, except when properly a part of the *res gestœ.* A witness was permitted to testify that immediately after an altercation between the defendant and the deceased, and about 10 or 15 minutes before the fatal shot was fired, "Mr. Gross was standing in that alley back of Costello's. I did n't see Mr. McCarty at all. I went down to Gross, and he said McCarty had gone to get a gun to kill him. I said, 'You had better go down to the shop.' (He was working for Mr. Hauser.) 'Go around to the shop and not have any fuss with him.'" Another witness testified that he overheard the altercation between the parties just preceding this statement, and said, "I heard John tell him he would go get his gun and kill him." It appears from the testimony of many witnesses that the defendant did go and get a gun, and did shoot and kill the deceased with it within a very short time. *Held,* That the admission of this testimony is not such an error as requires a reversal of the judgment.

2. SELF-DEFENSE—*Correct Charge—Verdict.* The defendant was charged with the crime of murder in the first degree. He admitted having killed the deceased, but claimed that the act was done in self-defense, and therefore justifiable. The court correctly charged the jury as to what constituted murder in both degrees, and what would justifiy the action of the defendant, and also charged with reference to manslaughter under various sections of the statute, but omitted to mention section 17 of the crimes act, or to give any instruction as to what would constitute manslaughter in the second degree as therein defined. The defendant was convicted of murder in the second degree. *Held,* That the facts in this case did not imperatively require the court to explain the law with reference to manslaughter in the second degree, as defined in section 17, and that no material error is shown by its failure to do so.

3. DEPOSITIONS — *Interrogatories.* The defendant in a criminal case, after a plea of not guilty has been entered, may take the deposition of absent witnesses, conditionally, upon a commission issued by the clerk of the court, and service of like notice on the prosecuting attorney of the time and place of taking such depositions as in civil cases; and where depositions are so taken, they need not be upon written interrogatories, as provided in § 351 of the code of civil procedure.

4. ERROR, *When Harmless.* Where a deposition so taken is excluded by the court, it is error; but where the substantial facts sworn to by the

absent witness are also proven by another witness whose testimony is wholly uncontradicted, and where the substance of the testimony excluded is concerning a remote and unimportant circumstance which could not possibly have much weight with the jury, the error is not such as warrants a reversal of the judgment.

*Appeal from Marion District Court.*

AT the March term, 1893, of the district court of Marion county, the appellant, *John E. McCarty* was tried, and convicted of murder in the second degree. He was charged with the murder of A. E. Gross. He admitted the killing, but claimed that the act was justifiable, and done in self-defense. The affair was witnessed by a considerable number of persons who testified in the case. The first trouble between the parties, shown by the evidence, occurred about a year before the killing. At that time, Gross accused McCarty of having sold a cow that was "about to be fresh" to one Hauser, that was afterward butchered by Gross. Some hot words passed between them at the time, and Gross wanted to fight; told McCarty to come out of doors and he would lick him. McCarty apologized, did not want to fight, and they made up their quarrel and apparently became good friends again. William Clarkson, a witness for the defendant, testified that about two weeks before the tragedy, on Main street in Marion, "Mr. McCarty was going up the street, and Mr. Gross and I were standing on the opposite side of the street. I made the remark that 'there goes McCarty up the street,' and Gross said: 'He do n't want to say anything to me; if he does, I'll put a hole through him.' I said 'that would be rather bad,' and he said, 'That's all right. I've got it in for the Irish son of a bitch, anyway.' I walked off and left him. I saw he was not feeling very good, and went away." One witness testified that on the morning of the shooting McCarty and Gross were going across the bridge, about 9 or 10 o'clock, and were talking loud. They met again at the Becker House, where they had an altercation at which there was talk of fighting, and one witness testified that Gross said:

The State v. McCarty.

"You God damned Irish son of a bitch; I'll fix you pretty soon." Henry Siebert, a hardware merchant, testified that the deceased came to his house on that day; that the witness was sick in bed, and deceased insisted on his going to the store to sell him cartridges for a revolver; that he said, "You can surely wait till Monday morning for the cartridges;" to which Gross replied: "No, I must have them right off. I'll tell you; John McCarty called me a Dutch son of a bitch. This is the second time he has done it, and I won't allow him to run over me any more. I am going to kill him." Afterward Gross and McCarty came together at what is called "Costello's corner," where several witnesses testified to their quarrelling, and one witness testified that Gross said: "'You follow me around the building,' or, 'Come around the building,' something like that, 'and I'll shoot your brains out.'" Ward Knowles, another witness, testified about this altercation, that Gross said: "Come down to the corner and I'll settle it with you;" that McCarty said, "I'll go get my gun and kill you." They both then started along the street, and, after going a little ways, McCarty crossed over to the other side and went in the gate at Doctor Rodgers' dwelling. Gross passed on down the street to the Becker place. In a short time, probably not more than 10 or 15 minutes, McCarty was seen crossing the street diagonally from the Rodgers corner toward the Becker House. Gross was standing on a sidewalk near the Becker corner. McCarty was carrying a double-barreled shotgun in his hand. When he had gotten within 25 or 30 feet of Gross, he raised his gun, took deliberate aim, shot, and killed him. At that time Gross had a pistol in his right hand at his side. McCarty then turned and walked away.

Other facts appear in the opinion herein, filed April 7, 1894.

*Frank Doster*, for appellant.

*John T. Little*, attorney general, and *C. M. Clark*, county attorney, for The State.

The opinion of the court was delivered by

ALLEN, J.: Three questions only are discussed, which will be considered in their order.

I. Error is claimed in the admission of the following testimony of the witness Samuel Kennedy: "Mr. Gross was standing in that alley back of Costello's. I did n't see McCarty at all. I went down to Gross, and he said McCarty had gone to get a gun to kill him." I said, "You had better go down to the shop." (He was working for Mr. Hauser.) "Go around to the shop and not have any fuss with him." It is contended that this was hearsay and highly prejudicial to the defendant, because it interposed a direct negative to his plea of justification, and imputed to him the very purpose and motive which he denied. The declaration does not appear to have been made in the defendant's hearing. It is not always easy to determine what is, and what is not, part of the *res gestœ*. The time intervening between the quarrel at the Costello corner and the shooting is not clearly fixed, but was not long. It hardly seems to have been more than was necessary for the defendant to prepare himself for the commission of the deed. If this were a case in which there was doubt as to the fact of the killing of the deceased by the defendant with a gun, or if there were any doubt as to the fact of McCarty having a gun in his possession with which he could have killed the defendant at the time the offense was charged to have been committed, we should hesitate to hold this declaration admissible; but in this case we are of the opinion that the testimony admitted was not seriously prejudicial to the defendant. Another witness testified to the fact that, during the quarrel between these parties at the Costello corner, McCarty had said that he would go and get a gun and kill the deceased. There is no pretense of denial that he did go and get a gun, and that he did use the gun which he did get to kill Gross. The fact of the killing with a gun was expressly admitted by the defendant on the trial. His only plea was a justification of the act,

claiming that it was done in self-defense. How then can it be said that this testimony could have seriously prejudiced the jury against the defendant? It may be said that it tended to show a deliberate and premeditated purpose in the mind of McCarty when he started from the Costello corner to commit murder; but the jury have acquitted the defendant of the charge of deliberate and premeditated murder, and have found him guilty only of murder in the second degree. The defendant, therefore, has not been prejudiced in that particular by the admission of the testimony. The crime of which he was found guilty by the jury was that of purposely and maliciously killing Gross. It is not claimed now by counsel, nor was it contended at the trial, that the shooting was not purposely done, but the contention was that it was in self-defense. Whether this claim of the defendant was well founded must of necessity be determined mainly from what transpired at the very time of the occurrence, from the manner in which the parties came together and in which they were armed, and their respective actions. Prior occurrences, it is true, would throw light on the frame of mind of each, and on their respective purposes; but as to which was the aggressor at that time, from all of the testimony in this case, there is no doubt. Gross, it is true, was armed, but there is no testimony in the record showing that Gross made any attempt to use his weapon. He held it down by his side. While counsel argue that it may be inferred from the testimony of one witness, to the effect that Gross was in a stooping posture, that he had his pistol pointed towards the defendant, we are unable to find any statement of any witness which goes so far as to show any attempt on the part of Gross to point his pistol at the defendant. On the other hand, all of the witnesses state that McCarty walked across the street with his gun toward Gross, and then that he raised it, took deliberate aim, and fired. These most important facts bearing on the guilt of the defendant were testified to, not merely by one, but by many witnesses, who agree in all the most essential particulars. In view of all this evidence, and

of the fact that the conviction is of murder in the second degree only, we do not think the admission of this testimony prejudicial error.

II. The court failed to instruct the jury upon the law of manslaughter in the second degree, as defined in § 17 of the crimes act, which reads as follows: "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or do any other unlawful act, after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree." It is urged that the court instructed with reference to manslaughter as defined by other sections of the statute, which could have no possible application to the facts in this case, and that this section which the court failed to mention is the only one, under the issue presented and the facts of the case, which could possibly have any application. It is insisted that it was the duty of the court to instruct the jury as to all matters of law applicable to the case without any request from the defendant, and that its failure to instruct with reference to an inferior degree is reversible error. It has been held by this court, in the case of *The State v. Dickson*, 6 Kas. 209, that "when the instructions complained of relate to a degree of crime inferior to the principal offense charged in the information, and inferior to that of which the defendant is convicted, they will be deemed not to have prejudiced the defendant, whether erroneous or not." (See, also, *The State v. Potter*, 15 Kas. 303; *The State v. Rhea*, 25 id. 581; *The State v. Yarborough*, 39 id. 588.) But we also think that, under the facts disclosed by the testimony, § 17 is not applicable.

There is absolutely no proof of an attempt on the part of Gross to committ a felony, or do any other unlawful act, which attempt had failed. It is true that there is proof of declarations of purpose on the part of Gross to kill the defendant, but there is no proof of an attempt to carry that purpose into effect. The only testimony tending to support that theory is that showing the threats by Gross, his having a revolver in his hand, and the statement of J. K. Evans

that "he was kind of stooping." An attempt to commit a felony is a criminal act, punishable under the law, but to constitute such an offense there must be some act done towards the accomplishment of the crime. The word as defined by Bouvier is, "An endeavor to accomplish a crime carried beyond mere preparation, but falling short of execution of the ultimate design in any part of it." The definition in Black's Law Dictionary is, "An effort or endeavor to accomplish a crime, amounting to more than mere preparation or planning for it, and which, if not prevented, would have resulted in the full consummation of the act attempted, but which, in fact, does not bring to pass the party's ultimate design."

But to bring the case within § 17, it must appear that the attempt has failed. For aught that appears in the evidence, the attempt was as much in the process of execution at the time the fatal shot was fired as at any previous instant. If the deceased was carrying forward a design to take the life of the defendant, he was in every respect as well prepared to execute that design as at any previous time. It is argued on behalf of the defendant that the attempt had failed because the defendant was armed, and in a position to shoot first, but we think the evidence tended to prove a full justification of the defendant's act rather than manslaughter as defined in § 17. There was evidence tending to show a purpose on the part of Gross to kill McCarty, and if Gross was bent on immediately attempting to carry that purpose into execution by shooting at the defendant with the revolver he then had in his hand, and if the defendant merely shot in self-defense, he was justified in so doing. Cases may easily be suggested of the kind referred to by counsel on the argument; as, if the deceased had fired the last charge from his gun, or if his weapon had been taken from him, or if he fired and turned to run, and many other possible cases.

We agree with counsel that the court should correctly charge the jury as to all the law applicable to every state of facts fairly supported by evidence, and that the rule de-

clared in *The State v. Dickson*, supra, ought not be extended
to unreasonable limits. But where the jury under proper in-
structions have found a defendant guilty of every element of
the superior offense, erroneous instructions or a total failure
to instruct with reference to an offense inferior in degree and
including less criminality cannot, logically, be said to have
influenced the jury. The failure of the court can only be said
to be prejudicial to the defendant on the theory that the jury
failed to fully comprehend the definition of the superior de-
gree, or misconstrued and misapplied the law to the facts.
To indulge in such presumptions, even though we know that
mistakes are made by juries and courts alike, is to overturn
the whole theory of the administration of justice.

III. After the defendant had entered his plea of "Not
guilty," a commission was issued by the clerk of the court to
take depositions in Chicago, and a notice was served by de-
fendant's attorney on the county attorney of the time and
place of taking such depositions. Under said commission
and notice, the deposition of Peter S. Toomey was taken.
This deposition was offered in evidence on the trial, and ex-
cluded by the court, because not taken on interrogatories. The
provisions of the criminal code concerning the taking of in-
terrogatories are not clear, and read as follows:

"Sec. 169. When any issue of fact is joined in any crim-
inal case, and any material witness for the defendant resides
out of the state, or, residing within the state, is pregnant,
sick, or infirm, or is bound on a voyage, or is about to leave
this state, such defendant may apply to the court in which
the case is pending, for a commission to examine such witness
upon interrogatories thereto annexed, and such court may
grant the same, upon the like proof and on the like terms as
provided by law in civil cases.

"Sec. 170. Interrogatories, to be annexed to such com-
mission, shall be settled, and such commission shall be issued,
executed and returned, in the manner prescribed by law in
respect to commissions in civil cases; and the depositions
taken thereon, and returned, shall be read in the like cases
and with the like effect as in civil actions.

"Sec. 171. The defendant in any criminal cause may also

have witnesses examined on his behalf, conditionally, upon a commission issued by the clerk of a court in which the cause is pending, in the same cases, and upon the like notice to the prosecuting attorney, and with the like effect in all respects, as is provided by law in civil actions."

Counsel for the state contends that § 169 alone applies when issue has been joined, and that by his plea of not guilty an issue of fact was pending at the time this deposition was taken, and therefore that interrogatories must be settled and annexed to the commission to make the deposition taken thereunder admissible. We are of the opinion, however, that § 171 applies after as well as before a plea has been entered. The language of the section is, that the defendant may also have witnesses examined on his behalf in the manner therein provided. A fair construction of the language seems to be that he may proceed in either manner at his own election. But it is urged that, inasmuch as § 171 provides for issuing a commission, and as § 351 of the civil code provides that, where depositions are taken under a commission as herein provided, they must be taken upon written interrogatories, unless the parties otherwise agree, interrogatories are still necessary where the defendant proceeds under § 171. The language, however, of this section is, that witnesses may be examined in the same cases and upon like notice to the prosecuting attorney, and with like effect in all respects as provided by law in civil actions. The section does not provide, nor does it contemplate, that the depositions shall be taken in the same manner as depositions are taken under a commission in civil cases. Where they are so taken, no notice is required, because they are taken on interrogatories, settled and annexed to the commission; but this section requires notice to the prosecuting attorney. The only object of such a notice is that he may be present, and, unless for the purpose of cross-examination, his presence would seem to be unnecessary. While § 171 requires a commission to be issued, it does not require interrogatories, but provides for notice.

IV. The evident purpose of the legislature seems to be to

allow the defendant to take the testimony of absent witnesses in substantially the same manner as it is taken in civil cases, on notice, with the added requirement that a commission shall first be issued by the clerk of the court. The court therefore erred in excluding the deposition of the witness Toomey. Should the judgment for that reason be reversed? The deposition is very short. The substance of it is as follows:

"I was present at a conversation and quarrel which took place between the deceased and the defendant in the cellar under the house in which Samuel Kennedy resided in the city of Marion, Kas., about one year before the shooting of the deceased. In this conversation and quarrel, Gross accused the defendant of selling him, or George Hauser, for whom he worked, a cow that was heavy with calf, which the deceased claimed to have butchered. The deceased was very much excited, and told defendant that he could lick him, and wanted him to go outside and fight him. The defendant refused to go out and fight, and told deceased if the cow was with calf he did not know it. The defendant during all the time seemed cool, and did not seem to be angered in the least. During the entire quarrel the deceased seemed to be the aggressor."

Samuel Kennedy, a witness for the state, testified on cross-examination as to the same conversation, as follows:

"Well, the way it was, Mr. McCarty sold to George Hauser a cow, and this Ed. butchered there, and she was just about to be fresh, and Ed. told him he didn't see what John wanted to sell the cow for. John said she was a fine cow, was not with calf at all. Ed. said she was. John disputed his word, and Ed. said it was so, and John called him a lying Dutch son of a bitch.

"Q. Gross wanted to fight, told him to come out of doors, and he would lick him? A. Yes, sir; John apologized, and they made it up.

"Q. John didn't want to go out to fight him? A. No, sir.

"Q. He declined to go out? A. Didn't want to go.

"Q. John declined to go out and fight him? A. Yes sir, he did.

"Q. They made it up, you say? A. Yes, sir; went off good friends, I suppose.

"Q. How long ago was that? A. Oh, it was a year ago last summer. I don't just recollect how long ago it was.

"Q. What words did McCarty use when he apologized to Gross? A. He said he would beg his pardon, he might be mistaken."

This is all the testimony shown in the record with reference to what transpired at that time. The only substantial difference between the version given in the deposition by the witness Toomey and that of Kennedy is the epithet which Kennedy testifies that the defendant applied to Gross. The substance of the statements of both witnesses is that Gross made an accusation against McCarty, which McCarty denied; that the men then passed hot words; that the deceased offered to fight; that the defendant was pacific and not inclined to fight. Kennedy's testimony also shows that McCarty apologized and begged Gross's pardon. We think the version of the affair given by Kennedy is substantially the same as that given by Toomey, and quite as favorable to the defendant as Toomey's. The occurrence was very remote from the tragedy. Its only possible bearing was on the state of feeling existing between the parties. In view of the subsequent occurrences shortly prior to the fatal meeting, which clearly disclosed bitter hostility between the men, the conversation at that time is certainly of very slight importance, and to reverse this judgment because of the exclusion of Toomey's deposition and the very slight variance between his version of the affair and that of another witness would be magnifying mere trifles to an unwarranted extent, and overturning the result of a trial where all of the essential and important facts were fully and clearly before the jury.

On the whole record, we are convinced that the guilt of the defendant is clearly and abundantly shown, that no injustice has been done him, and the judgment is affirmed.

All the Justices concurring.