THE STATE OF KANSAS, *Appellee*, v. CHARLES ALEX-
ANDER and FLOYD ALEXANDER, *Appellants*.

No. 18,405.

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*State Impeaching its Own Witness—Judicial
   Discretion.* The rule that a party is not allowed to impeach
   his own witness is subject to exceptions. Where a witness for
   the state had testified on direct examination to a commotion
   and to the appearance of a wounded man, and on cross-exami-
   nation had testified to exclamations made by the wounded
   man, testimony of another witness for the state that the wit-
   ness first referred to was drunk at the time is considered ad-
   missible in the discretion of the court.

2. HOMICIDE—*Exclamation of Deceased—Admissible.* Where a
   wounded man coming out of a stairway from an upper room
   exclaimed, "I'm shot," and then said, "Take me home," and
   being asked "Who shot you?" gave the name of one of three
   persons who were with him in the room immediately before the
   shooting, and the wounded man died in about ten minutes
   afterwards, his exclamation and answer are admissible in
   evidence.

3. IMPEACHING WITNESS—*On Collateral Matter—Inadmissible.*
   Evidence should not be admitted to contradict a statement of
   a witness elicited upon cross-examination upon a purely col-
   lateral matter which does not tend to prove or disprove an
   issue in the case, the contradictory evidence being offered by
   the party eliciting the statement.

4. HOMICIDE—*Evidence of Scuffle Before Shooting—Exclusion
   Was Error.* A witness for the state testified to an encounter·
   between several persons in which one was shot. A defendant
   who was present at the affray testified that another, also
   present, fired the shot. He was then asked whether there was
   a scuffle before the shooting. In the circumstances shown the
   evidence was admissible, and an objection on the ground that
   the question was leading was not well taken, although the
   objection might have been avoided by relating the entire oc-
   currence.

5. REMARKS—*Of Attorney in Closing Argument—Improper and
   Prejudicial.* A remark in the closing argument for the state
   in a criminal action about turning the defendants loose to get
   into trouble in other communities for carrying razors is im-

proper where the evidence does not show that they have been in trouble caused in that way. Upon timely objection an instruction should have been given to prevent misapprehension by the jury.

6. HOMICIDE—*Instructions Relating to One Jointly Charged— Misleading.* An instruction that the jury have nothing to do with the charge against a person not on trial but against whom there is evidence of guilt, may be understood to refer not only to the information but to the evidence imputing guilt, and if so understood is misleading. A clause should have been added to make the meaning clear.

Appeal from Edwards district court. Opinion filed April 12, 1913. Reversed.

*Charles E. Lobdell,* of Great Bend, and *Charles A. Baker,* of Kinsley, for the appellants.

*John S. Dawson,* attorney-general, *Wilber E. Broadie,* of Kinsley, and *M. A. Merten,* county attorney, for the appellee.

The opinion of the court was delivered by

BENSON, J.: The defendants appeal from a conviction for manslaughter in the fourth degree in killing H. C. Bussenbark at Belpre, in Edwards county.

Charles Alexander and H. W. Bennett met in a pool room and engaged in wrestling and in drinking whisky. For further wrestling and to procure more whisky, Bennett, who was a barber and had his chair in the pool room, obtained a key from the proprietor, and the two men went upstairs to a hall above, where they continued drinking and wrestling. Bussenbark was a bystander in the pool room and had not joined in the drinking, but accompanied the others to the hall. A few minutes after the men left the pool room the proprietor heard a noise as of chairs being overturned above, and going to the street door saw Bussenbark coming down the stairs from the hall, and heard him exclaim, "I 'm shot," and also heard him say, "Take me

home." Asked who shot him, he answered, "Bennett." He was taken into a restaurant near by and died in about ten minutes. . Floyd Alexander followed the wounded man down the front stairs, and the evidence tends to show that he assisted him in leaving the hall. Charles Alexander came down the back stairs, also in a wounded condition. Bennett, badly intoxicated, sat down in a chair in the hall and fired a shot down through the floor.

A witness who had gone into the hall by the back stairway for a drink of whisky and stopped in a dressing room testified that through a partially opened door he—

"Saw the two Alexanders, Bussenbark and Bennett at the head of the stairs. . . . Heard conversation among party as to wrestling. Heard Bennett say, 'Here, Curley, you take these things while I go on the mat.' Did not know what was referred to. In about ten minutes after that heard some one say in tone of surprise rather than anger, 'Why, you son of a bitch!' Did n't know who said this. Opened door then and looked out. Saw 'Red' (Chas.) Alexander hit Bennett a blow on the top of the head and knock him down. Heard Red say 'Give me that gun' and turn facing Curley (Floyd). The latter started towards his brother. Bussenbark stepped forward and said 'No, you don't.' At this time Bennett rose and got into the *melee*. They mixed up for a minute and the gun was discharged. Bussenbark cried out that he was shot. Curley and Bussenbark left the opera house by the front door, the former assisting Bussenbark. Bennett and Red were grappled. Bennett had a 'hammerlock' hold on Alexander. As they turned around in the scuffle witness saw the gun 'in both their hands but rather in Alexander's hand than in Bennett's and Bennett had ahold of Alexander's hand.' This was the first time witness had seen the gun. While in this position the gun was fired again. Then Alexander said, 'If you 'll let me go I 'll get out of here.' Bennett said, 'Go, damn you.' As Alexander ran for the back stair Bennett fired at him but seemed to miss. Then Bennett sat down on a chair like a man exhausted. . . .

Did not see the gun at any time till after Bussenbark and Curley had left the opera house. Did not know 'Red' Alexander's voice, but saw his lips move when he said 'Give me that gun.' Did n't know to whom this was addressed."

Floyd Alexander testified that he did not go up the front stairs with the others, but went later up the back stairway.

The pistol used in the affray belonged to Bennett and was found in the chair in which he sat down after the affray. This weapon was a Colts automatic, with barrel two inches in length. Four shells were found in the hall, also a bullet hole through the floor and one in the wall. A bullet was found in the wound in Charles Alexander's back.

The defendants are brothers. Floyd is twenty-one years of age and Charles is older. Their home is in Attica. They have been engaged as laborers at Hutchinson, Macksville and in the country about for several years. Both have been arrested for disturbing the peace and for assault, and one of them for selling intoxicating liquor. Each of them testified that they saw Bennett fire the shot that wounded Bussenbark, and that neither of them ever held the pistol. Charles Alexander, in his direct examination, was asked if there had been a scuffle between himself and Bennett before the shooting, but upon an objection that the question was leading he was not allowed to answer. Bennett was not called as a witness.

In producing its evidence the prosecution called the proprietor of the pool room, who testified to the scuffling or wrestling in that room, the departure of Bennett, Charles Alexander and Bussenbark for the hall above, and the noise of the chairs and disturbance there, but was examined no further. On cross-examination by the prosecution he testified that he assisted the wounded man from the stairway and heard his exclamations before referred to. The county attorney

objected to the evidence of what Bussenbark said, but it was received. Afterwards the prosecution produced testimony, to which an objection was made, tending to prove that this witness was greatly intoxicated at the time to which his testimony related.

Charles Alexander testified that while in the hall above the pool room Bussenbark drank about three-fourths of a pint of whisky, after Bennett had taken a small drink from the bottle. This testimony was elicited on cross-examination. In rebuttal the state was allowed to prove over the defendant's objection that upon a post mortem examination of the body of the deceased no smell of whisky was perceived.

The prosecuting attorney in his closing argument said:

"We might have turned the Alexanders loose to go into other communities to raise disturbances there, to get into trouble for selling liquor, and for carrying razors."

There was no evidence that either of the defendants had been in trouble for carrying razors. When asked whether he had attempted to kill a man with a razor, Floyd Alexander testified that he had not, but admitted that he had a razor at the time of making an assault for which he had been tried. This remark of the county attorney was objected to, and a request was made for an instruction to the jury to disregard it. The request was denied. At the close of the argument the defendant requested an instruction to the effect that evidence of previous troubles elicited upon cross-examination was competent as bearing on their credibility as witnesses but should not be considered as tending to create a probability that they were guilty of the crime with which they were now charged. This request was refused.

Among the instructions given was the following:

"The defendants, Charles Alexander and Floyd Alexander, are charged in the information jointly with one

H. W. Bennett, but are not being tried jointly with the said H. W. Bennett, and in this case you have nothing to do with the charge against H. W. Bennett and should not consider that charge in arriving at your verdict in this case."

Assignments of error are based upon the rulings referred to. Complaint is made because the prosecution, after calling a witness to prove the events that led up to the affray, was allowed to impeach this witness by testimony that he was drunk at the time. An answer is made to this objection by the suggestion that the only material testimony which could be affected by the impeachment was the repetition of the alleged statement of the wounded man that Bennett had shot him, and that statement, it is contended, was incompetent. The general rule forbids an attempted impeachment by one who has first called the witness. (*Johnston v. Marriage,* 74 Kan. 208, 86 Pac. 461.) The rule is subject to exceptions, but the discussion of this principle in the case cited makes it unnecessary to examine it at any length here. The state here went no further in the line of impeachment than to show the mental condition of the witness. While the testimony of drunkenness tended to weaken the force of the witness's testimony elicited on cross-examination, it had a similar effect upon his evidence in chief, and we can not say that it was not within the discretion of the district court to admit it. Besides, another witness testified to the exclamations of the wounded man, and no contradictory evidence appears. The testimony that this witness was drunk, even if erroneously admitted, was probably not prejudicial.

In this connection it is deemed proper to say that the evidence of the exclamation referred to, and to which the state objected, are deemed admissible. (*The State v. Morrison,* 64 Kan. 669, 68 Pac. 48; *Campbell v. Brown,* 81 Kan. 480, 106 Pac. 37.)

The testimony that the post mortem examination

gave no evidence of intoxicating liquor in the stomach was produced it seems to contradict the testimony of one of the defendants that Bussenbark partook freely of whisky just before his death. The rule that a party is not allowed to contradict testimony of purely collateral facts elicited on cross-examination appears to have been violated. Whether the victim participated in the drinking was an inquiry that did not tend to show who bore a guilty part in the tragedy. The collateral inquiry was of no consequence except to give an opportunity to contradict the witness, and for that purpose it was not admissible.

The examination of defendant Charles Alexander as a witness was unduly restricted by sustaining the objection to the question whether a scuffle had preceded the shooting. It is true the objection was that it was leading—and the objection might have been avoided by calling upon the witness to relate the occurrences, still no good reason is apparent why the question in the form asked should not have been allowed. The principal witness for the state had testified to an encounter which might be called a scuffle, and the defendant should have been allowed to testify whether a scuffle preceded the shot without reciting the occurrences in detail in his examination in chief.

The implication in the closing argument of the prosecutor that the defendants had been in trouble by carrying razors is conceded in the brief of the state to have been improper, but with the suggestion that it was not prejudicial. It must be remembered that several persons were participating in a drunken bout. One was killed; there was no certain evidence on the part of the state to prove who fired the shot. The vicious character of any one taking part in the affray would naturally be considered of moment. The question and answer both referring to a razor may have been confused in the minds of the jury by the objectionable remark in the argument. Attention being at once

The State v. Alexander.

called to it, the situation merited such an instruction as would have prevented any misapprehension.

The instruction quoted above was objected to. It may be variously interpreted. To one trained in court procedure the statement that the jury had nothing to do with the charge against Bennett would not be misapprehended. Others might understand that the charge meant not only the information but the evidence imputing guilt. If understood in the latter sense it was misleading. It was a question for the jury whether Bennett or one of the Alexanders fired the shot that killed Bussenbark. While it is true that the defendants may have been guilty participants, even if Bennett was the principal, still the jury ought not to have been precluded from considering the evidence that charged him with the shooting. The word "charge" sometimes means to make liable, and the jury may have so understood it. A clause should have been added to make the meaning clear.

The testimony relied on to support the verdict does not show who fired the fatal shot, and seems inconclusive as to the part taken by the defendants in the tragedy. A careful examination of the record has been made to determine whether the errors referred to probably led to a result which otherwise would not have been reached, although in other circumstances they might perhaps be disregarded. The district court, it appears, approved the verdict with hesitancy. This court is not satisfied that justice has been done and it is concluded that the errors referred to should not be disregarded.

The judgment is reversed and the cause remanded for a new trial.