No. 23,352.

THE STATE OF KANSAS, *Appellee*, v. DELBERT YOUNG,
*Appellant*.

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Homicide—Evidence—Statements of Deceased as to His Purpose in Leaving Home Admissible.* In a prosecution for murder in which it is established that when the victim of the homicide left his home a few hours before his death he was carrying a bucket, it is not error to admit evidence that he stated at the time the purpose for which he was taking it—one having no connection with the killing; and it is held that in the present case such evidence, even if it had been incompetent, would not have been prejudicial.

2. SAME—*Verdict Not Wrongly Influenced by Conduct of Trial Judge.* It is held that no sufficient reason for setting aside a verdict of guilty in a murder case upon the ground that it was coerced by the conduct of the judge is shown by proceedings thus summarized: At 4:45 p. m. of Saturday, the second day of the jury's deliberation, the judge, after being told by the foreman that he believed an agreement was not far off, announced that a separation until Monday morning would be allowed. Upon a suggestion of the defendant's counsel that the jury be sent out again the judge stated that he was going to take a train in twenty-five minutes but would give the jury time for another ballot. At 4:54 the verdict was returned.

3. SAME—*Homicide—Omission to Instruct Relative to Manslaughter in Second Degree Not Error.* The section of the statute making it manslaughter in the second degree to unnecessarily kill another "either while resisting an attempt by such other person to commit any felony, or do any other unlawful act, after such attempt shall have failed" does not apply where the defendant killed a person while he (the decedent) was in the very act of striking at him with a hammer. And it is held that if on any theory of the facts an instruction under that section might have been justified in the present case, the omission to give it cannot be relied upon as error, because of the failure of the defendant's counsel to make a request therefor.

Appeal from McPherson district court; FRANK F. PRIGG, judge. Opinion filed July 9, 1921. Affirmed.

*G. Nyquist,* and *Frank O. Johnson,* both of McPherson, for the appellant.

*Richard J. Hopkins,* attorney-general, *Alex S. Hendry,* county attorney, *Sam Jones,* of Lyons, and *James Galle,* of McPherson, for the appellee.

The opinion of the court was delivered by

MASON, J.: Delbert Young was prosecuted for the killing of his brother, Claude Young. He was convicted of murder in the second degree, and appeals.

The circumstances of the homicide, as related by the defendant, his testimony being largely corroborated by that of his wife and Alice Swabby, a niece of the brothers, were substantially. as follows:

For four years the defendant and the deceased, Claude Young, had had some trouble which was more or less connected with the possession of a quarter section of land belonging to the niece referred to and controlled by her guardian, she being but 14 years of age. The defendant had at one time occupied the land, but gave it up on notice that Claude had procured a lease from the guardian. The south portion of this tract was in wheat, the north being used as a pasture, separated from the cultivated ground by a fence. The defendant lived on an adjacent quarter. On the morning of the tragedy he left his home in a carriage accompanied by his wife, his niece, and·six children, the oldest nine years of age. His purpose was to look at the wheat field, in which the niece was interested in virtue of her ownership of the land, and also to see if there were any ducks in a pond a little north of the pasture on the adjoining quarter. As the party were on the highway they were passed by Claude on horseback going in the other direction toward his home on a neighboring tract. The defendant drove west along the south side of the wheat field and north along the west side, entering the pasture through a gate at its southwest corner. He drove far enough northeast to see that there were no ducks on the pond and had turned around to drive west along the south fence of the pasture to reach the highway again when Claude, still on the horse, overtook him (having entered the enclosure from a gate near the southeast corner) and rode alongside the carriage to the north or left of it. Claude, who was the larger and stronger man, after calling the defendant a vile name, and ordering him to get off the place, struck at him several times and tried to drag him out of the carriage as he rode by its side, tearing the buttons from the defendant's coat in doing so. The attack continued until the gate was reached. There Claude stopped and

dismounted. The defendant drove south along the highway about seventy-five or a hundred feet, possibly further, and stopped, got out of the carriage, took from it and loaded a shotgun which he had brought along to shoot ducks, went back a little ways—he could not say how far, not as much as fifty feet—toward his brother, and told him to ride on around and go on. The defendant then stepped backward to a place by the side of the carriage near the left rear wheel. Claude rode up and undertook to go around him, and when just east of him attempted to strike him with a hammer held in his right hand. Just as he did so the defendant stooped and threw up the gun. The hammer held by Claude struck the gun and it exploded, blowing a portion of the skull from the back of the head on the right side, and causing practically instant death. The gun became disconnected, the barrels separating from the stock. The defendant at the trial did not know whether he had pulled the trigger or not. He did not at any time admit that he intentionally discharged the gun, but it was obvious that as he testified he had in mind the theory of self-defense as well as that of accidental homicide. The defendant's wife gave testimony to this effect: After the defendant got out of the carriage the team went on; she also got out and went back to the gate, where the two brothers were, and asked her husband to come on home. He said he would not until Claude went on around. Urged by her, however, the defendant walked with her about half way to the carriage, when Claude remounted and shortly followed them, overtaking the defendant near the carriage.

Alice Swabby, who lived with the defendant's family, testified that her sympathies were with him in his controversy with his brother; that at the time of the homicide she heard another noise (obviously meaning that of the hammer striking the gun) as loud as the report of the discharge, which followed it almost immediately.

The state had but little direct evidence with which to refute the defendant's story. A witness who saw a part of what took place just before the killing from a distance of three-quarters of a mile gave a version contradicting that of the defendant in some important particulars, especially in that he was confident the defendant's wife did not get out of the carriage, and his estimate of the distance the defendant had

The State v. Young.

driven before getting out and starting toward his brother exceeded that of the defendant. The widow of the deceased testified that she knew what kind of hammers he and his people used about the premises, and she did not recognize a hammer which was found leaning against his body as any they had ever had. A man who had passed Claude on the road shortly before the encounter saw no hammer. Mutual threats between the brothers were shown.

The foregoing statement of the evidence, while not complete, is doubtless sufficient to show the bearing of the rulings of the trial court of which complaint is made.

1. Complaint is made of a ruling permitting the wife of the deceased to testify that when he left home on his horse on the day of the homicide he took with him a galvanized bucket; that she asked him where he was going and he said he was taking the bucket over to empty the cattle tank (presumably the one in the pasture referred to)—to bail it out. We regard the evidence as clearly admissible as tending to explain the act in which the speaker was engaged. (The State v. Pearce, 87 Kan. 457, 124 Pac. 814, annotated on this point in Ann. Cas. 1913E, 358.) Moreover the ground of the objection appears to be merely that the evidence does not come within any rule making it admissible. No way is suggested and none is apparent in which even if that were the case it could have prejudiced the defendant. The defendant's wife when testifying in his behalf said that she saw Claude riding toward the pasture carrying such a bucket on his saddle, so the fact that he had it may be regarded as established. There is nothing in the record to suggest that Claude left his home with any expectation of finding the defendant on the Alice Swabby land, or of meeting him. He was apparently returning home from that tract when he first met the defendant and his family in the carriage. Probably the defendant's theory is that evidence that the deceased said he was going to the pasture and was taking the bucket to bail out the tank had some tendency to show that he was not engaged in an errand requiring the taking along of a hammer, the question whether he had such an implement with him being one of the controverted matters. Neither the admitted fact that he carried the bucket nor that fact coupled with the assumption that he carried it to bail out

34 —109 Kan.

The State v. Young.

the tank could have had any substantial tendency to show that he might not also have had some other errand, for instance— as the defendant suggests in his brief—to repair a fence or building. And as is justly said in the defendant's brief the admitted facts showed that at the time Claude first met the defendant and his family driving in the carriage "he had already done what he told his wife he was going to do and had fully completed that transaction."

2. The defendant contends that the jury were coerced into returning the verdict by the conduct of the judge. The case was given to the jury on Friday. At 4:45 p. m. the next day the jury were returned to the courtroom and proceedings were had which are thus stated in the record:

"By the Court: Gentlemen of the jury, we desire to learn whether there is any probability of an agreement of the jurors on a verdict?

"By the Foreman: Your Honor, we have not arrived at a decision but I have reason to believe that we are not far off.

"By the Court: You believe there is a prospect of an agreement?

"By the Foreman: I have reason to believe we are not far off.

"By the Court: We would not want to put this county to the expense of trying this case over again if there is any possibility of its being decided by the jury. I suppose you gentlemen all want to go home over Sunday anyway. I will not make you work on Sunday, but I want to admonish you gentlemen not to talk about this case while you are separated. It has come to me that parties have been talking about this case in the presence of the jury where they have congregated. If anything of that kind has happened it is wrong, and if you jurors happen to hear anybody talking about it, you go away from the men who are talking in your hearing. If people try to talk in your hearing tell them that you are a juror and not to talk in your hearing about it. That is very important, gentlemen. It might happen that after you got a verdict and after all this time has been spent and the expense the county has been to in trying this case, that it would have to be tried all over, and I don't believe any of you want that to be done. You are all tax payers and interested in the business affairs of your county, and things of that kind might make it necessary to try the case all over, and for that reason I hope you will be very careful not to talk about it among yourselves nor let any one else talk to you about it or in your hearing even if you have to get up and go away from some one who might persist in talking about it. If you find a bunch of people together talking about it, get away from them and do not hear it talked about. And reserve your final conclusion until you are again assembled in your jury room. We will take a recess until Monday morning at ten o'clock, or as soon as the train gets in from the south on the Rock Island. Some of you might have occasion to come in on that train and that is the train I will be in on,

The State v. Young.

and as soon as that train gets in court will convene immediately upon the arrival of that train.

"By Mr. Banta [one of the defendant's attorneys]: Your Honor, the Court pardon me, it isn't quite five o'clock and the foreman announces that the jury is about to agree, and I would suggest that they be sent out again.

"By the Court: My train goes in twenty-five minutes,—

"By Mr. Banta: Well, then,—

"By the Court: I know exactly what I am calculating on doing and I know when my train goes and all about it. I haven't got time to send this jury out again.

"By the Court: Gentlemen of the Jury, do you think if you had fifteen minutes time you might reach an agreement or not?

"By the Foreman: Well, I couldn't say as to that.

"By the Court: You think there would be any prospect of an agreement in the next fifteen minutes if I gave you that much time?

"By the Foreman: I wouldn't want to say that but I will state what I said before that I have reason to believe we aren't far from a decision.

"By the Court: Well, I will give you time for another ballot, gentlemen. You may retire to your jury room and take another ballot, but I want to catch my train. You may retire to your jury room and take another ballot and see if you can come any nearer getting together. I would like mighty well to have it decided tonight if possible.

"By Mr. Banta: (as jury leaves jury box) Now, if the Court please, I want the record to show that we object to the wish of the Court as expressed to the jury that a verdict be reached prior to the Court's leaving.

"By the Court: All right."

At 4:54 of the same day the jury returned a verdict of guilty of murder in the second degree. It must be presumed that the considerations which led the judge to adhere to his plan of taking the train instead of remaining to receive the verdict if it should be reached on Saturday evening were of such importance as to justify the course he took. This court cannot undertake to condemn his action in that regard—especially when it is without information as to the circumstances by which it may have been affected. For the court to tell the jury that unless an agreement is reached by a specified time at which the absence of the judge is to become necessary they will be permitted to separate over Sunday, with directions to return Monday morning, does not amount to coercion either in reason or under decisions in similar cases. (16 R. C. L. 298, citing notes in Ann. Cas. 1912D, 450 and 1915D, 677.) The request for a further opportunity to reach a verdict in the short time that was available before the arrival of the train came from the

defendant's counsel. Even after the judge had distinctly stated his purpose of adhering to his plan of taking the train no objection was made to sending the jury out again. Apart from this, however, we see no basis for holding that error was committed. It is suggested in behalf of the defendant that the jury were sent out merely to take another ballot—not to deliberate. The trial court is not to be held to so literal an interpretation of the words used. As intelligent men the jurors must have understood the situation and known that they were at liberty to judge for themselves how much additional deliberation should precede the ballot, if they saw fit to take one.

3. The only remaining ground upon which a reversal is asked is the omission of the court to give an instruction permitting a verdict of manslaughter in the second degree under the statute reading as follows:

"Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or do any other unlawful act, after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree." (Gen. Stat. 1915, § 3378.)

Instructions were given that a conviction might be had of murder in the first or second degree or of manslaughter in the third or fourth degree. No instruction was asked concerning manslaughter in the second degree. If the testimony of the defendant is true his brother Claude was killed in the very act of striking at him with the hammer—while the defendant was resisting an attempt to murder him, or at all events to perpetrate a felony upon him, and before such attempt had failed. This court has held that the section quoted has no application to such a situation—that it can apply only where the felonious attempt has ceased. (*The State v. McCarty*, 54 Kan. 52, 36 Pac. 338.) And that is the interpretation placed upon the statute in the state from which Kansas adopted it. (*State v. Harper*, 149 Mo. 514, 527.) The original enactment in some other jurisdiction, from which the section was obviously derived, undoubtedly contained the word "or" before the phrase "after such attempt shall have failed," for the section appeared for some time in that form in the statutes of New York. (See for instance 3 Revised Statutes of New York, 5th ed., p. 940, § 11.) But the word "or" in this place was never included in the Missouri or Kansas act. If the testimony of

the defendant was true he killed his brother in resisting an attempt to murder him or at least to commit a felony upon him, and (as the court properly instructed) in that case the homicide was justifiable. (Gen. Stat. 1915, § 3370.) There could have been no purpose in telling the jury that acts which the law held to be innocent might constitute manslaughter in the second degree. It is true the jury might have disbelieved the story told by the defendant and have found a mitigation of the offense from facts, the existence of which they inferred even although he had testified to the contrary. (*The State v. Jackett,* 81 Kan. 168, 105 Pac. 689.) But if by any possibility the evidence was capable of such interpretation as to warrant the giving of an instruction concerning manslaughter in the second degree that aspect of the matter was latent and not patent. Therefore no complaint can be made of the omission to instruct on the subject unless the attention of the court was called to the subject by a request to do so. (*The State v. Winters,* 81 Kan. 414, 105 Pac. 516; *The State v. McCarty,* supra; *The State v. Davidson,* 109 Kan. 13, 197 Pac. 1104.) In the defendant's brief it is said that "the defendant makes two defenses, one justifiable homicide and the other accidental homicide caused by the act of the deceased himself." If at the trial it did not occur to the defendant's counsel that the evidence warranted an instruction concerning second degree manslaughter they cannot reasonably contend that such an issue was obviously involved, and that the court erred in overlooking it. And if they did have it in mind their failure to call the attention of the trial court to it precludes them from pressing the objection now.

The judgment is affirmed.