The State v. Nixon.

---

No. 24,018.

THE STATE OF KANSAS, *Appellee*, v. W. A. NIXON, *Appellant*.

SYLLABUS BY THE COURT.

1. HOMICIDE—*Evidence—Privileged Communications.* A statement made by a client to an attorney during consultation may be introduced in evidence against the client over his objection where the statement had no connection with the subject matter about which the client was consulting the attorney.

2. SAME—*Qualification of Juror.* On a motion for a new trial, where the truth of the answers given by a juror concerning his qualification to sit as such is questioned and evidence is introduced tending to show that the juror had not answered correctly and other evidence that he had answered truthfully is presented, the finding of the trial court that the juror was qualified will not be disturbed in this court.

3. SAME—*Motion for New Trial—Newly Discovered Evidence—No Showing of Diligence.* An order denying a motion for new trial requested on the ground of newly discovered evidence will not be reversed where there was no showing of diligence to procure the evidence for use on the trial.

4. SAME—*Evidence—Identification of Person by Voice Over a Telephone.* A witness may identify another person by the latter's voice over a telephone in conversation with him. The completeness of the identification goes to the weight of the evidence, not to its admissibility.

5. SAME—*Murder in First Degree—No Request for Instructions Concerning Lesser Degrees of Crime—None Given—No Error.* Where a defendant on trial charged with murder in the first degree does not request any instruction concerning murder in the second degree nor any instruction concerning any of the degrees of manslaughter, and the evidence establishes that if he is guilty at all he is guilty of murder in the first degree; it is not error for the court to fail to instruct the jury concerning murder in the second degree or manslaughter.

6. SAME—*Murder Resulting from Conspiracy—Instructions.* There was evidence sufficient to justify the court in giving instructions concerning the law of murder resulting from conspiracy.

7. SAME—*No Reversible Error Shown.* To secure a reversal of a conviction of murder in the first degree, reversible error must be shown.

Appeal from Barton district court; WILLIAM C. HARRIS, judge *pro tem.* Opinion filed June 23, 1922. Affirmed.

*F. Dumont Smith, Carr W. Taylor, Eustace Smith,* and *John H. Connaughton,* all of Hutchinson, for the appellant.

*Richard J. Hopkins,* attorney-general, *Charles B. Griffith, Dennis Madden,* assistant attorneys-general, *William J. Weber,* county attorney, *Elrick C. Cole,* and *R. C. Russell,* both of Great Bend, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The defendant was tried for the murder of Arthur C. Banta, was convicted of murder in the first degree, and appeals.

1. Complaint is made of the admission of the evidence of R. C. Russell, an attorney at law. The defendant contends that the evidence of Russell was admitted in violation of the fourth subdivision of section 321 of the code of civil procedure, which in part reads:

"The following persons shall be incompetent to testify: . . . Fourth, an attorney, concerning any communications made to him by his client in that relation, or his advice thereon, without the client's consent."

It is argued that the part of the conversation detailed by the witness came within this prohibition. A. L. Wallace operated a restaurant in Great Bend. The defendant had a chattel mortgage on the restaurant. It seems that one Shepler had commenced an action of forcible entry and detainer to obtain possession of the property. The defendant went to Russell to talk about the matter. On the trial, Russell was questioned concerning the conversation between them, as follows:

"Q. Before he advised with you, did you have any conversation with him or overhear any conversation relative to the deceased, Arthur Banta? A. Yes, sir.

"Q. Did that conversation that you had with defendant, Nixon, at that time, have anything to do with the advice that you had to give to him that afternoon? A. Well, I didn't so consider it.

"Q. You may state what that conversation was."

After these questions the jury retired, and Mr. Russell made the following statement to the court:

"Dr. Nixon came into my office and came right into my private office. I was at my desk and he says, 'This man Banta is double crossing everybody. I didn't think he would double cross me but I am thoroughly satisfied that he is and he is a double crossing ————, and is trying to do it again,' and we had some little conversation about that side of it, in other words that is the substance of it and then he went into the legal matter he came up to advise about. The legal matter was with reference to the forcible entry and detainer of Curly Wallace from his restaurant building, that was being prosecuted by Mr. Shepler and we talked there about the forcible entry and

The State v. Nixon.

detainer suit and he told me that Banta had told him that he could keep them in that building until December without any question, he would guarantee that he could do that without giving bond for double the rent, and I told him that I did not know of any law by which that could be done, and we got down the Statutes and other books and went into that and then he tried to get Curley Wallace by 'phone, 'phoned to his office and Curley's restaurant four or five times. I told him I didn't want to advise him positively as I didn't know of any way they could stay in there until December without giving bond for double the rent. Well, he said that he can do it, he will show all you ————— some new law. I said, 'Well, it will be new law to me and he might be able to do it, I don't know,' and he stayed there about an hour and when he got through he said, 'What do I owe you' and I said, 'You don't owe me anything,' and he went out he took a $5.00 bill out and put it on my desk."

After the jury returned, Mr. Russell answered as follows:

"Dr. Nixon came into my office and said substantially as follows: 'I always knew that Arthur Banta was a double-crossing ————— and that he double-crossed everybody, but I didn't think he would double-cross me,' or words to that effect."

On the hearing of the motion for a new trial, in discussing this proposition, the court said:

"The evidence of Mr. Russell as to a statement that Dr. Nixon had made to him regarding Mr. Banta, it is urged that that is error. I looked that matter up rather carefully before I made the ruling on it, and I am not inclined to change the ruling made at this time. I don't think that a man may come into a lawyer's office and talk about matters that have nothing whatever to do with his business that he is there upon, and come in and claim that it is a confidential communication so that the attorney cannot testify. In this case I think this evidence was just as competent, as I don't think anybody would claim that if the defendant had gone into Mr. Russell's office and said to him, 'I am going kill Banta,' and then consulted with him, it would claim such a matter was privileged; so I am satisfied with that ruling."

In 40 Cyc. 2371, this language is found:

"In order for a communication between attorney and client to be privileged it must relate to the subject matter of the employment, and be made for the purpose of enabling the attorney to correctly understand the matter in which he is employed, and of obtaining professional advice or assistance."

The rule as there stated is supported by *The State v. Newherter,* 46 Iowa, 88; *Moyers v. Fogarty,* 140 Iowa, 701; *Denunzio's Receiver v. Scholtz,* 117 Ky. 182; *Marsh v. Howe,* 36 Barb. (N. Y.) 649; *Dixon v. Parmelee,* 2 Vt. 185; and Note, *Denunzio's Receiver v. Scholtz,* 4 Ann. Cas. 531. The trial court rightly concluded that the communication so far as it was admitted in evidence was not privileged under the statute.

2. Complaint is made concerning a juror named Elridge York. The defendant says, "The man York not only swore that he had no opinion, but went further and swore that he had not recently talked with anyone concerning the case, when the truth was that he was talking about the case with his neighbors at the very moment he was called as a venireman." A witness, Frank Case, testified on the hearing of the motion for a new trial as follows:

"I was standing in front of the court house while the jury was being empanelled in the case of *State v. Nixon,* and while standing talking to some gentlemen Mr. E. York came along. Mr. Gardner, one of the gentlemen to whom I was talking, said, 'Mr. York, you had better look out or they will get you on the jury.' Mr. York replied, 'No, they won't. I can't sit on the jury because I have formed an opinion in this case.' Just then Mr. Sam Kellam, clerk of the court, called Mr. York and said that the sheriff wanted him."

York, on his *voir dire,* testified:

"I remember the circumstances of the killing of Mr. Banta. The circumstances were discussed among my neighbors and friends. From what I read and heard I did not form any opinion as to the guilt or innocence of the defendant, and I have not any opinion now. I never talked to anyone who claimed to know anything about this case. No one has talked to me about the case lately. I know of no reason why I should not be permitted to sit as a juror in this case."

From the brief of the defendant, it may be gathered that York on the hearing of the motion for a new trial testified as to the conversation had by him, as follows:

"I know Cliff Gardner and Frank Case. I saw them on the corner there by the Citizens National Bank, just before I was summoned as a juror. There was quite a little crowd there. Cliff Gardner came up and he said, 'They can't get us on this jury in the Nixon case, can they, York, because we have all formed our opinion,' and I said, 'I guess so.' Just at that time Sam Kellam came across and said, 'There is Mr. York. Your name is drawn.'"

The court on the hearing of the motion said:

"I believe Mr. York when he stated he had no opinion of the guilt or innocence of the defendant when he was qualified as a juror in this case, and I believed his remarks that he made today that he entertained no opinion of it at that time; so I think he is not guilty of any misconduct in this case to procure his seat on the jury, or afterwards."

A similar complaint is made of a juror named Ernest Miller. The defendant states that Miller "swore that he had no opinion and had not talked with anybody about the case." The defendant contends that this statement was not correct and that Miller had said

to one Frank Grommes about the middle of September, "Well, I think Dr. Nixon is as guilty as the other two." When the motion for a new trial was heard, Frank Grommes testified to having such a conversation with Miller. Miller on that hearing testified:

"Q. That night you were playing at Dan Casey's, or at any other time prior to the Nixon trial, had you formed or expressed any opinion as to the guilt or innocence of Dr. Nixon? A. No, sir; not that I remember of.

"Q. Did you tell anyone at that dance at Dan Casey's, or at any other dance, that Dr. Nixon was just as guilty as the others? A. No, sir.

"Q. Did you say anything of that kind or character? A. No, sir."

The court, after the motion for a new trial had been presented, said that his statement concerning Elridge York applied to Ernest Miller.

On the examination of the jurors nothing appeared to show that either York or Miller was in any way disqualified. From the evidence introduced on the hearing of the motion for a new trial, the court might have concluded that either had formed an opinion in the case; but the court was entirely justified in the conclusion that was reached and in holding that both were competent jurors. That finding of the trial court is just as conclusive as any other finding made by the triers of fact on evidence from which reasonable minds might reach different conclusions.

3. A. L. Wallace and Roy Hayes testified as witnesses for the state. They were charged with the murder of A. C. Banta and had been confined in the jail of Barton county. The defendant argues that these men were guilty of the murder of Banta and that they conspired to fasten the crime on the defendant. On behalf of the state, evidence was introduced tending to show that, during the absence of the officers, Wallace and Hayes had not communicated with each other and had no opportunity of so communicating, for the reason that they were confined in different parts of the jail and were not allowed to be together. Two other persons, Willie Rippey and Harry Barnett, were prisoners in the jail during all or a portion of the time that A. L. Wallace and Roy Hayes were confined therein prior to the trial of the defendant. Willie Rippey and Harry Barnett were not produced as witnesses on the trial; but they were produced on the hearing of the motion for a new trial. No showing was made as to why they were not produced on the trial. They testified that Wallace and Hayes were with each other repeatedly and that they talked to each other. Rippey testified that he heard

Wallace say that he did the killing. Barnett testified that he was frightened away by the officers, who told him that if he came to the courthouse he was liable to get into trouble. The court held that diligence to obtain that evidence was not shown. It was incumbent on the defendant to show that he had exercised diligence to procure that evidence. That showing was not made.

4. Complaint is made of the admission of the testimony of Earl Jordan. He testified that he had a telephone conversation with a man whom he identified as W. A. Nixon on the night that Banta was killed; that Jordan was at the Elks' Club; that he answered the telephone when it rang; and that the person at the other end of the line called for Arthur Banta, the deceased. Jordan was questioned concerning his recognition of the voice on the telephone line. He stated that he could not swear to a man's voice over the telephone, but that he was satisfied in his own mind who it was that talked to him and stated that the voice was that of the defendant, W. A. Nixon. A person can be recognized by his voice the same as by his face or his form, although recognition by the voice may not be as easy over the telephone as by talking face to face. The testimony of Mr. Jordan showed that in his judgment the person talking to him was W. A. Nixon. That rendered his testimony competent, although his hesitancy may have affected its weight; that, however, was a matter for the jury.

5. The jury was not instructed concerning murder in the second degree nor any of the degrees of manslaughter. The defendant complains of the failure of the court to so instruct the jury. No such instructions were requested.

Arthur C. Banta was killed about four and one-half miles west of Great Bend, on a cross-country road which was not much traveled. His body was left by the side of the road near his automobile. Four shots had been fired into his body—one wounded a thumb; one entered his arm; and two were fired into his breast. He was a small man, weighing about 119 pounds. There was evidence which tended to show that he was killed soon after nine o'clock in the evening; that shortly previous to that time, the defendant telephoned to Banta who was then at the Elks' Club and asked him to come to Nixon's office; that Banta went to Nixon's office; that the two got into Banta's car and drove west in the city of Great Bend; that Banta was recognized in the car while it was going west; that Nixon also was recognized, not directly but by the coat that he wore which

was produced and identified on the trial; that Nixon had made arrangements with Hayes to go in Nixon's automobile to the place where Banta's body was found and to approach the place with dimmed lights on the car; that Hayes was signaled to go by Nixon when the latter and Banta started to leave Great Bend; that Hayes did as he was signaled and drove to the place named by the defendant where he saw Banta's car; that Nixon there got into the car with Hayes; that Nixon told Hayes to sit over, took the wheel, and drove rapidly into Great Bend; and that Nixon stated to Hayes that Banta would not owe anybody else. Nixon denied being at the place when Banta was killed and introduced evidence tending to prove that fact. The evidence tended to show that the bullets— three of them—taken from Banta's body, had been fired from a 32-20 Colt's revolver and that the defendant owned such a revolver. There was evidence which tended to show that A. L. Wallace and Roy Hayes were connected with the defendant in the killing of Banta, but that evidence did not tend to reduce the degree of the crime of which the defendant was guilty, if he were guilty.

From the evidence presented to this court as above briefly summarized, it appears that the defendant must have been guilty of murder in the first degree or that he was not guilty at all. The defendant's counsel by their failure to request an instruction of murder in the second degree or of manslaughter must have recognized this fact and must have felt that it would be better for the defendant to go to the jury on a charge of first degree murder alone and attempt to secure an acquittal rather than risk a verdict of murder in the second degree or some degree of manslaughter. Under the evidence and by reason of the failure of the defendant to request such an instruction, it was not reversible error for the court to fail to instruct the jury concerning murder in the second degree or the several degrees of manslaughter. (*The State v. Newton,* 74 Kan. 561, 87 Pac. 757; *The State v. Winters,* 81 Kan. 414, 105 Pac. 516; *The State v. Truskett,* 85 Kan. 804, 820, 118 Pac. 1047; *The State v. Curtis,* 93 Kan. 743, 752, 145 Pac. 858; *The State v. Roselli,* 109 Kan. 33, 40, 198 Pac. 195; *The State v. Young,* 109 Kan. 526, 200 Pac. 285.)

6. The defendant contends that error was committed by the court in giving instructions numbered 4 and 14. The fourth instruction read:

"If you believe from the evidence, beyond a reasonable doubt, that the

defendant Nixon and Hayes, or Nixon, Hayes and Wallace entered into an agreement or arrangement by which they were to take money or other personal property from the person of Arthur C. Banta, the deceased, by force or putting him in fear, which acts would constitute robbery, and in furtherance of such agreement an attempt to carry out to completion such arrangement, Arthur C. Banta came to his death at the hands of either of said parties to such agreement at the time and place and in the manner charged in the information, a killing of the deceased in furtherance of such agreement would constitute murder in the first degree and the defendant Nixon would be guilty even though he did not personally fire the alleged shots which killed Banta and although he might not have even been present when such alleged act was committed; all of the parties participating under such circumstances are principals and equally guilty. In such event as before detailed, none of the parties may have intended to kill Banta but if, in attempting to carry out such agreement or arrangement, if he met his death, it would constitute murder in the first degree and the state, under such circumstances, need not prove that the actual killing, if any, was deliberated upon or premeditated upon and planned in advance."

The part of the fourteenth instruction material for the consideration of this complaint read as follows:

"If you have a reasonable doubt in your minds as to the presence of the defendant at the place of the killing of Arthur Banta, and his participation therein you should acquit the defendant—unless you shall believe from the evidence, beyond a reasonable doubt, that an agreement or arrangement had been entered into between the defendant, Nixon, and Hayes and Wallace, or either of them, to take money or personal property from the deceased by force or putting him in fear and that in furtherance of said agreement, Arthur Banta was killed, then as hereinbefore instructed, the defendant would be a principal and equally guilty whether he was present or not at the time of the actual killing of said Banta."

The argument of the defendant is that there was no evidence on which to base these instructions. The defendant's brief contains the following language:

"Hayes testified that Dr. Nixon went out with Banta and killed him and he went out and picked the doctor up and the crime was then complete; no one else there. Wallace testified that Dr. Nixon told him that Hayes first shot Banta while he (Nixon) was over in the wheat field, and when he came back he held Banta while Hayes finished the killing."

Wallace testified that he had a conversation with the defendant shortly previous to the time defendant left Great Bend on the evening that Banta was killed. That conversation is abstracted by the defendant as follows:

"He [the defendant] said, 'Al, you aren't going?' I said, 'no.' He said, 'you have got cold feet?' I said, 'no.' I got out of the car, opened up the door, started over and got over and he kind of honked the horn and we stood there

and talked a few minutes, several words passed, I don't know, he honked the horn, he said, 'Come here' motioned for me. I went back and he said, 'You fix an alibi,' I said, 'very well' and I went in and fixed an alibi."

Another part of the evidence of Wallace is abstracted by the defendant as follows:

"He [the defendant] said, 'Curly, he owes me this money and I am going to have it.' I said, 'In what way are you going to get it?' and he picked up a piece of paper—oh, I am ahead of my story there. He said to me, 'I am going to get it if I have got to kill the ————.' I said, 'Well, Doctor, that won't gain you anything.' He said, 'I can mark the bill paid' or something like that and pretty soon we talked around there and he picked up a piece of paper, which was a note, and he said, 'I am going to make him sign this note' and hit his hand on the desk and I said, 'Doctor, you can't make him sign that note because he is an attorney and it would just mean harm to you to undertake to try it' and he said, 'I don't see how, if he ever signs this note, how it will mean harm to me.' I said, 'very well.' I fooled around and went out."

There was evidence sufficient to justify the court in giving instructions four and fourteen.

7. Another proposition urged by the defendant is as follows:

"This court within very recent years has twice reversed criminal cases, not because there was error enough in the records to have reversed the cases, but because there was error and coupled with that error was the fact that this Court, after reading the record, felt a strong doubt of the defendant's guilt."

The defendant cites *The State v. Alexander*, 89 Kan. 422, 131 Pac. 139, and *The State v. Henson*, 105 Kan. 581, 185 Pac. 1059. In *The State v. Alexander*, supra, this court said:

"The testimony relied on to support the verdict does not show who fired the fatal shot, and seems inconclusive as to the part taken by the defendants in the tragedy. A careful examination of the record has been made to determine whether the errors referred to probably led to a result which otherwise would not have been reached, although in other circumstances they might perhaps be disregarded. The district court, it appears, approved the verdict with hesitancy. This court is not satisfied that justice has been done and it is concluded that the errors referred to should not be disregarded." (p. 429.)

In *The State v. Henson*, supra, the court said:

"We are unable to say that there is no reasonable probability that the verdict was influenced by the rulings, held to have been erroneous, relating to the admission and exclusion of evidence bearing upon the vital matters in controversy. Their cumulative effect increases the likelihood of actual prejudice having resulted. The conviction must therefore be set aside." (p. 591.)

The defendant's argument is necessarily based on the theory that this court may be dissatisfied with the correctness of the verdict and would be disposed to reverse the judgment on slight error. The jury heard the evidence and returned a verdict of guilty of murder in the first degree; the trial court approved that verdict; and this court, after reviewing the evidence as set out in the abstracts, must say that it too is satisfied with the verdict. The evidence that has been summarized in this opinion compels the conclusion that the defendant deliberately murdered Arthur C. Banta.

No error has been found, and the judgment is affirmed.