No. 31,574

The State of Kansas, *Appellee*, v. George Post, *Appellant*.

(30 P. 2d 1089.)

Opinion filed April 7, 1934.

*Charles Hudson, Clyde M. Hudson* and *L. C. Gabbert,* all of Wichita, for the appellant.

*Roland Boynton,* attorney-general, *Everett E. Steerman,* assistant attorney-general, *John W. Wood,* county attorney, and *James B. Nash,* deputy county attorney, for the appellee.

The opinion of the court was delivered by

Burch, J.: Defendant, George Post, was convicted of murder in the second degree, and appeals.

About midnight of Friday, January 6, 1933, defendant shot and killed Forrest Woodring. That night defendant's wife, Beulah Post, who was allowing Forrest to display an amorous disposition toward her, was brutally beaten. Forrest was thirty-three, and single. Mrs. Post was thirty-four, and her husband was nineteen years older.

Forrest's father, Roy Woodring, and his wife, who was Forrest's stepmother, lived a city block from the Posts, and on the opposite side of the same street. Forrest returned to the Woodring home after an absence of some three years. The next morning, Friday, December 29, 1932, Forrest was introduced to Mr. and Mrs. Post. That evening Mrs. Post drove her car over to the Woodring home and asked to "borrow the boy" to drive her down town. Her husband was sick, she wanted to go driving, and she offered to pay Forrest a dollar to drive the car, just no place in particular. Forrest ac-

cepted, drove away with Mrs. Post, and they returned late that evening.

On Sunday morning Mr. and Mrs. Woodring left for a visit to relatives in Oklahoma. Forrest went over to the Post residence. He saw Mrs. Post on Tuesday, and was at the Post home on Wednesday and Thursday and Friday. Mrs. Post testified Forrest would make improper advances to her, said her husband was too old for her, and would ask her to go over to the Woodring house with him. On Friday afternoon Forrest wanted Mrs. Post to go with him, but finally left the Post home, saying he was coming back in the evening and would bring some alcohol and get George (Post) drunk. That evening Mrs. Post drove over to the Woodring house. Forrest was there alone. She asked Forrest not to come to her house that night and bring liquor, because George was mad and tired, and it wouldn't do. She also testified she told Forrest she was going to the Graves home, a mile and a half away, which she did. She left her husband eating his supper and taking care of the baby. Mr. and Mrs. Woodring returned from Oklahoma about 9:30 that night. A light was burning in the house, Forrest's supper was on the table, untouched, his overcoat and hat were gone, and he was not there.

Mrs. Post testified she stayed at the Graves home until 9 o'clock or a little later. She then told this story: As she left the Graves home, shortly after 9 o'clock, Forrest was standing at a corner, and forced himself into the car. He was drunk and mean, wanted her to drink with him, and she finally agreed to drink with him if he would then let her go home. They drove to a pop stand, the engine was stopped, and she sat in the car while Forrest bought some pop. He mixed a drink, she drank it, and she very soon became unconscious. She remained in a stupor several days. She did not know how or when she got home.

After Forrest had been killed, a doctor was called to the Post home. Mrs. Post had been struck on the head, her left eye was swollen and discolored, she had a lump over her right eye, and she had a discoloration over her hips and in the middle of her back. In the absence of evidence of what occurred, one interpretation of the injuries might be that she had been pommeled in the face and on the head, knocked down, and stamped or kicked.

Before his wife came home George had been taking an interest in the whereabouts of Forrest and of Mrs. Post. About 8 o'clock

George went to the Woodring home, where a light was burning, but found no one. About 10 o'clock he returned to the Woodring home, and found Mr. and Mrs. Woodring there. Mr. Woodring asked if he had seen Forrest. He said no, and his wife was gone, too. He described her movements when she went to the Woodring house to warn Forrest. He said he intended to wait at a certain place, he had a man waiting at another place, and he "was going to catch him, and smoke her up." He exhibited a pistol, told of giving his wife $30, and said she just went to rooming houses to drink with other men. He was tired of it, and was sure going to smoke her up. He promised he would not hurt Forrest if he was with her, because she was to blame.

Post went home, and Mr. and Mrs. Woodring went to bed. Later the Woodring telephone rang. Mrs. Woodring answered, and Post asked her to turn on the light in the dining room of her house. She turned on the light, and then went back to bed. Later, Post entered the Woodring house from a back porch, appeared at Mr. and Mrs. Woodring's bedroom, and asked if Forrest had come in yet. Mr. Woodring answered that he did not know. Post left the bed-room, went through the living room, through the dining room, and passed through a door opening on a back porch which was screened and roofed. The screen door of this part of the porch opened on a small uncovered part of the back porch, the floor of which was reached from the ground by two steps. On the outer edge of the floor was a pile of stove wood some four feet high. Presently the Woodrings heard the noise of wood falling off the porch. They went right out, and saw Post standing on the porch with his back against the house, and with the pistol in his hand. Just as Mr. Woodring reached the door he heard Post say, "You God damned son of a bitch, I'll learn you!" Forrest was lying on wood on the ground. Mr. Woodring said, "George, you have killed the boy!" Post said, "No, he isn't; she is lying over there in a pile, too."

Forrest had a wound above the left ear, through the scalp to the skull, made by some blunt instrument. A bullet had entered the lower left region of the back of Forrest's neck, had traveled through the muscles of the neck to the right side of the skull, and had there been deflected to the center of the brain. When Post went home, he hid the pistol behind his chicken house, but later showed the deputy sheriff where it was. The pistol was a 38-caliber Colt's frontier model, and held six cartridges. There were five in the weapon. No other cartridge was found, and no empty shell was found.

Forrest was unarmed. When his father went to Forrest's body, he found in Forrest's overcoat pocket a bottle of coca cola, and an implement about as long as a lead pencil with a bottle opener at one end and an ice pick at the other. Mr. Woodring threw the articles on the ground, where they were subsequently found. When the body was taken into the house, another bottle of coca cola was found in a pocket of Forrest's overcoat. Post helped carry the lifeless body into the house.

George Post was a witness in his own behalf, and gave this account of his contrived meeting with Forrest:

"I started home, going out on the east porch, and there I met the boy coming up on the porch. He had something bright in his hand, I didn't know what it was. He said, 'out a little late,' and I said, 'yes, a little bit.' He said, 'let's have a drink,' and I said, 'no, I am looking for my wife.' I had my gun in my hand, down like that, and he came up under my arms and threw the gun up and bumped my head against the building, the side of the house. We struggled, and went over the wood pile, both of us. I don't know how he lit, but I lit on my head, and it dazed me for awhile. When I got up I didn't have the gun, and saw it lying down beside him. I picked the gun up, and went to tell Roy, but just as I got on the porch Roy and his wife came out. Roy asked what had happened, and I said, 'why, the boy made a damned fool of himself.' . . . When Forrest and I scuffled and fell over the woodpile, I didn't hear any shot at all. I heard no report of gun. I don't know that Forrest was ever shot. I did not examine him. All I know of the cause of his death is what I've been told. I had no idea how he came to be hurt."

Post also testified as follows:

"I did not know when I met Forrest Woodring that night that he had been trying to get my wife to go to Kansas City with him, or that he had ever driven my wife's car, or gone with her that night or before. I had no malice or ill will towards Forrest. And I didn't have any idea what caused him to grab my arm that night. I never knew of his talking to my wife until four or five days after the 6th. I did not beat my wife up or cause her injuries."

Post made two statements with respect to the first he saw of his wife after she left home about 7 o'clock in the evening:

"I then went home, and found my wife in bed; she was all beat up, and I could not rouse her; . . . The first I saw of my wife was, after the fracas I saw the car out in the street at the (Post) back porch."

How the supposedly unconscious woman got out of the car, into the house, and in bed, was not explained.

Post did not "remember" calling the Woodrings and telling them to turn on their lights, and did not "remember" many other important things. He admitted he might have told the Woodrings he was going to "warm somebody up with that gun."

It will be recalled Mrs. Post testified that when Forrest got in her car near the Graves place, he was drunk and mean; and that she became unconscious soon after she drank while sitting in the car at the pop stand, and remained unconscious. Therefore, the mean, drunk man and the unconscious woman were somewhere for about three hours before they got home. At some time after she became unconscious she was cruelly beaten. The testimony was that about two hours before Mrs. Post returned, Post displayed his pistol and made threats against her at the Woodring home, and said he and another man would wait for the prodigals to return. Promptly after they returned Forrest was killed, and the state's evidence was Post said she was "lying over there in a pile, too."

Under the state's theory of the homicide, the notion that Mrs. Post received her injuries while she was unconscious was pitifully absurd. When she and Forrest returned, Post beat her and then sought Forrest and killed him. The two events were integral parts of one composite transaction in which Post executed his preconceived purpose to do violence. Mrs. Post's testimony, and Post's denial that he beat her, would leave no alternative except that Forrest was responsible for her injuries, and make it likely Forrest would attack Post if confronted by Post, pistol in hand, at the Woodring home. In this rather unique situation, the mental state of each man at the time of the transaction, including disposition to do violence to members of the group of persons, was relevant and material.

Mrs. Post was cross-examined, over objection, with respect to beatings her husband had previously given her. Her attention was directed to an incident occurring some four years before the homicide. She said she believed Post was drunk at the time, there was a piece in the paper which was a sad mistake like newspaper stuff is, but Post did not beat her. Defendant contends the purpose of the testimony was to show Post was a drunken wife beater. If so, the purpose failed. The testimony was he did not beat his wife, and the fact that on one occasion four years before the homicide he was intoxicated, furnished no basis for inference he was a drunken wife beater. However, the testimony of Mrs. Post relating to the incident probably left an impression something serious had occurred, and the state inquired about later acts of violence. Mrs. Post testified she and her husband had quarreled and fussed, if that were fighting they had fought, and Post had struck her. As indicated,

the testimony bore directly on the question who was the aggressor throughout what took place after Mrs. Post and Forrest came home. In the discussion in the district court concerning admissibility of the testimony, the county attorney gave an untenable reason for offering it. This fact does not indicate the court admitted the testimony for the stated reason, and whatever the reason for it, the ruling was correct.

Defendant admitted having the pistol in the Woodring home and at the time of the homicide, and said he always carried a pistol at night. The court instructed the jury it was a misdemeanor for defendant to carry on his person in a concealed manner the pistol introduced in evidence, but that defendant was not on trial for that offense; and evidence purporting to show he did carry a concealed weapon could be considered only for the purpose of determining defendant's intention in carrying the weapon. Defendant complains of the instruction, and his brief says the evidence is replete with exhibitions of the pistol, and not concealment. The weapon was twice carried into the Woodring home in a concealed manner. Post testified he changed the weapon from one pocket to the other in the Woodring home. The weapon was exposed to view twice only, once in the Woodring home in connection with threats against Post's wife, and once as Forrest was coming up on the porch where Post stood after Post had prepared for a meeting with Forrest at the Woodring home. The remainder of the discussion of the instruction in the brief has even less substantiality than the initial statement regarding the evidence.

Defendant took pains to formulate instructions to the jury and to request that they be given. There were three of them, and there is no contention the subjects were not adequately covered by instructions which the court gave. Defendant did not request instructions relating to manslaughter, and the court did not instruct the jury on the subject of manslaughter. Under the instructions given the jury could find defendant guilty of murder in the first or second degree only; otherwise it was the duty of the jury to acquit. Promptly after the verdict was returned defendant filed a motion for new trial, on the ground the jury had not been instructed on the subject of manslaughter in the different degrees.

In his brief defendant says his testimony embraced facts placing the case squarely within the statute defining manslaughter in the first degree, and disclosed facts clearly within the statutory defini-

tion of manslaughter in the third degree. He also says the evidence most assuredly disclosed facts showing defendant was in the heat of passion. The verdict of guilty of murder in the second degree recommended clemency, and defendant asserts that if manslaughter had been submitted to the jury, he would have been found guilty of manslaughter in some degree, only.

According to defendant's contention the necessity for instructions relating to lesser offenses was patent and not latent (*State v. Young*, 109 Kan. 526, 533, 200 Pac. 285) ; and the requirement of substantial evidence tending to prove guilt of a lesser offense involved in the main charge (*State v. Cunningham*, 120 Kan. 430, 243 Pac. 1006), was satisfied. If this be true, the question arises, why did defendant's counsel omit from the studied request for instructions, instructions on the subject of manslaughter, and so protect defendant from conviction of murder? The court is perfectly familiar with the practice, and the answer is simple and obvious.

Defendant was a grievously wronged husband. His victim was his wife's would-be seducer. Experience teaches there was strong probability a sympathetic jury could be induced to acquit, rather than convict of murder. If given opportunity the jury would certainly convict of a lesser offense, entailing comparatively light punishment. If the jury should convict of murder, error in failing to give proper instructions might be urged in an appeal to this court.

At the trial of a case of this kind, counsel for defendant must decide whether he will request instructions relating to manslaughter, just as he must decide whether he will place his client on the witness stand. Having decided not to make the request, he has waived instructions on manslaughter, and must abide the result. This is familiar law in this state. However, to prevent a miscarriage of justice, the court will examine the proceedings to see if the verdict of guilty of the greater offense was based on satisfying evidence, and was returned under proper instructions relating to that offense. (*State v. Winters*, 81 Kan. 414, 421, 105 Pac. 516; *State v. Stout*, 114 Kan. 585, 591, 220 Pac. 180.)

In this instance defendant's testimony disclosed he was looking for Forrest Woodring at the Woodring home about midnight, and for the third time that night. He was carrying a pistol. Defendant met Forrest coming up the steps of the Woodring home. Defendant had the pistol in his hand. Forrest was then and there killed by a bullet fired from a pistol. While Forrest lay at de-

fendant's feet, defendant had the pistol in his hand. Defendant helped to carry the body into the house, where he remained and assisted in the calling of a doctor and of "the law." Defendant then went home, and hid the pistol. Under these circumstances it was an insult to the intelligence of the jury for defendant to say he heard no shot, did not know Forrest was ever shot, had no idea how Forrest came to be shot, and all he knew of the cause of Forrest's death was what he was told.

Defendant was charged with murder. He requested an instruction on the subject of self-defense, a theory of the killing incompatible with the testimony just recited. The jury was instructed on the subject of self-defense, and the jury rejected that defense.

Defendant's brief in this court makes the following statement of fact:

"The only defense was accidental discharge of the weapon while struggling and falling with the rick of wood from a high porch."

This defense was incompatible with the testimony just related, was submitted to the jury, and was rejected.

Murder in the first degree was fully proved. A competent and conscientious trier of the facts could reach no rational conclusion except that defendant committed murder, and defendant has the jury to thank for the verdict of murder in the second degree. Manifestly the probability or the certainty that, because of defendant's sore provocation, the jury would have convicted him of manslaughter only, if that subject had been submitted by the instructions, cannot be considered. The court cannot sanction a criminal procedure which invites a jury to palter with the law and the evidence.

There is nothing else in the case of sufficient merit to require discussion, and the judgment of the district court is affirmed.