No. 45,250

THE STATE OF KANSAS, *Appellee*, THOMAS EUGENE METCALF, a/k/a
THEODORE E. METCALF, a/k/a GENE METCALF, *Appellant*.

(452 P. 2d 842)

Opinion filed April 12, 1969.

*Orval L. Fisher*, of Wichita, argued the cause, and *James F. Foster*, of
Wichita, was with him on the brief for the appellant.

*Keith Sanborn*, county attorney, argued the cause, and *Kent Frizzell*, attorney general, and *David P. Calvert*, deputy county attorney, were with him on
the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: A jury convicted Thomas Eugene Metcalf of the
offense of murder in the first degree and prescribed life imprisonment as the penalty. Metcalf's motion for new trial was overruled,
he was sentenced and has now appealed.

The information upon which appellant was convicted charged
he killed Roy Dan Hawthorne by shooting him in the head with a
30-30 caliber rifle.

The locale of the shooting was appellant's place of business located in the basement of his home at 1538 North Erie in Wichita.
The basement contained a crap table, bar, jukebox, dance area and
facilities for serving food. Appellant owned or rented the house
and was the person in charge. He employed a doorman, an operator for the crap table and also girls to tend bar and wait on
customers.

Briefly, the prosecution's evidence showed that at about 6:10 a. m.
on July 4, 1967, some thirty to forty people were present in appellant's place of business. Appellant had relieved the crap table
operator and taken over the game. Twice appellant rolled dice
against the decedent Hawthorne and won. Some words of dis-

agreement between the two ensued and then the game resumed. Appellant lost what money he had, then went upstairs and came back with a 30-30 caliber rifle which he left at the bar. He then returned to the crap table. Appellant, who had been drinking, spilled his own drink while handling money. He accused Hawthorne of spilling the drink and demanded he buy liquor to replace it. Hawthorne refused, saying he was not drinking. Appellant snatched money from Hawthorne's hand, asserting he was going to take three dollars with which to buy liquor. He ordered a half pint of whiskey, which a girl brought. Appellant put three dollars on the table. Hawthorne reached over and picked up the three dollars. Appellant told Hawthorne "You owe $6 in the box." Hawthorne said he was getting his three dollars back. Appellant told the doorman to get his rifle, which the doorman did.

The appellant then declared the game over. At this time there were four dollars in the box on the crap table, two of which had belonged to Hawthorne. Hawthorne said he wanted his money. Appellant picked up the money and threw it on the table and said, "Here it is. You want to pick it up? Pick it up, you're bad. You M . . . F . . ., I'll blow your brains out." (The expression "You're bad" used in connection with "pick it up" was shown to be a "dare" to Hawthorne to pick up the money.) Appellant then took the rifle from the doorman. Hawthorne reached for his money, saying he wanted only what was his. Appellant struck Hawthorne across the hand with the barrel of the rifle. Appellant was standing and Hawthorne was seated at this time. Hawthorne did not pick up the money although appellant continued to dare him saying, "I ought to blow your brains out" and "Don't reach in those boxes, ask for what you want." A bystander told appellant to put down the gun, the hammer of which was in a cocked position. Appellant uncocked the gun and put it down to his side.

Hawthorne started to stand and put his money in his pocket when appellant produced the rifle again and pointed it directly at Hawthorne. Appellant said, "I done got tired of people taking my money, so I'm going to blow somebody's brains out." As Hawthorne raised up, appellant followed his head up with the rifle. One witness testified the decedent said, "This makes the third time you done pulled a gun on me. It looks like you're laying off to shoot me. You might as well go on and kill me." According to

another, Hawthorne said, "Well, this makes the third time you done put that gun on me. Every time I come down here, you put your gun on me. Looks like you want to kill me anyhow. Go on and shoot." A third testified Hawthorne said, "You drawed the gun on me three times. You might as well go ahead on and shoot me this morning, go ahead on and kill me." A fourth attributed decedent with saying, "This make the third time you put this gun in my face. Every time we get together, looks like you want to kill me. If you want to kill me, go on and shoot me." The gun then discharged, the bullet shattering the left side of Hawthorne's face, killing him instantly.

Upon appeal appellant first asserts the trial court erred in refusing to order the prosecution to produce for his inspection certain tape recordings of statements of witnesses to the shooting given to police officers soon after the incident. The issue was raised before and during trial. In *State v. Jones,* 202 Kan. 31, 446 P. 2d 851, this court rejected the same contention of error. The record here reveals no reason to deviate from that ruling (see also *State v. Oswald,* 197 Kan. 251, 261-262, 417 P. 2d 261).

Appellant complains the trial court erred in refusing to permit him to testify he saw the decedent carrying a pistol upon two prior occasions. He also complains of the exclusion of a receipt for the purchase of a pistol which receipt was found in decedent's billfold after the shooting. The billfold had previously been introduced into evidence by the prosecution and, apparently inadvertently, the receipt had been left in the billfold before it was actually exhibited to the jury.

Appellant argues the excluded evidence was relevant as to his state of mind. This could be true if he had pleaded self-defense. However, his defense was that the shooting was not intentional but was accidental and therefore excusable. The appellant did testify. His testimony was to the effect he thought the gun was unloaded. There was nothing in his testimony, or in any other evidence offered at the trial, to indicate appellant actually shot in self-defense or that he had any reason to shoot in self-defense. There was no evidence decedent carried a pistol or other weapon at the time of the shooting. The uncontradicted evidence was that decedent was standing with his empty hands at his sides. He had made no threats toward appellant and appellant conceded in his trial testi-

mony decedent had made no aggressive move toward appellant. Self-defense never became an issue. Upon this state of the case the court properly excluded the proffered evidence as irrelevant. That which has been said is also applicable to appellant's complaint he was restricted in his cross-examination of a prosecution witness as to prior possession of a pistol, plus the fact the witness denied the premise sought to be elicited.

Appellant complains the prosecution was given undue latitude in its cross-examination of one of his witnesses, a girl employed by appellant to wait on tables in his place of business. Upon direct examination she stated one of the eyewitnesses, who had testified for the prosecution, had said shortly before the trial began that appellant had not intended to kill the decedent. The state was permitted, over objection, to elicit the fact she lived at appellant's home, that appellant paid the rent and provided money for her food and clothing. She denied any conduct of an illicit nature. Appellant argues the testimony prejudicially suggested the offense on his part of keeping a house of prostitution. We think the examination was relevant and within proper bounds for the purpose of determining the interest and credibility of the witness, and we are aware of no rule excluding this type of evidence because incident to it an inference of wrongdoing by appellant could conceivably be drawn.

By various motions appellant challenged the sufficiency of the evidence to convict him of murder in the first degree, and he renews that challenge. We have only briefly highlighted the evidence given in a lengthy and hotly contested trial which included testimony by five eyewitnesses to the shooting. Essentially, the evidence showed animosity on appellant's part, express threats to kill, aggressive acts by him over a period of time prior to the shooting, and use of a dangerous weapon with fatal result. All the elements of first degree murder, malicious intent to kill, deliberation and premeditation, could reasonably be inferred therefrom, and that determination is the extent of our review on the question.

So far as appellant's evidence conflicted with that of the prosecution, a jury question was raised and the jury's verdict resolved any differences. The theory of accidental shooting was submitted to the jury under proper instructions but was rejected. It might be

pointed out this defense was further contradicted by the testimony of a firearm expert, who had examined and tested the rifle, that the weapon could not be discharged without pulling the trigger and could not be fired by hitting it upon the floor or a table or desk. The defense of accident was further impaired, before appellant could make effective use of it, by admission into evidence of a statement he made immediately after the shooting as follows: "Where's that knife he had?", and by statements to the effect that Hawthorne had a weapon and that he had acted in self-defense. Appellant's contention the rifle was always unloaded was diluted by his admission there had shortly before been cartridges in it which his crap table operator requested him to remove. All of this was properly jury work and need not be further labored.

The court instructed the jury on both first and second degree murder but not upon any lesser degree of homicide. Appellant requested instructions only as to fourth degree manslaughter. He now asserts error in the court's failure to instruct as to all degrees of manslaughter. Appellant is hardly in a position to complain of failure to instruct upon first degree manslaughter when, as a matter of trial strategy developed during questioning of a witness, he exacted assurance from the court no such instruction would be given. But beyond this, the rule has been well established that when a defndant has been charged with and convicted of murder in the first degree, the correctness of instructions relating to manslaughter becomes immaterial. This rule was perhaps most simply stated and explained in *State v. Kelly*, 131 Kan. 357, 291 Pac. 945, by the following quotation from *State v. McCarty*, 54 Kan. 52, 36 Pac. 338:

"'. . . where the jury under proper instructions have found a defendant guilty of every element of the superior offense, erroneous instructions or a total failure to instruct with reference to an offense inferior in degree and including less criminality cannot, logically, be said to have influenced the jury. The failure of the court can only be said to be prejudicial to the defendant on the theory that the jury failed to fully comprehend the definition of the superior degree, or misconstrued and misapplied the law to the facts. To indulge in such presumptions, even though we know that mistakes are made by juries and courts alike, is to overturn the whole theory of the administration of justice. (p. 58.)'" (p. 364.)

(See, also, cases cited in *State v. Spencer*, 186 Kan. 298, 304, 349 P. 2d 920).

We have considered other contentions advanced by appellant, including his allegation of misconduct on the part of the prosecuting attorney and his request for new trial on the basis of newly-discovered evidence, but find no merit in them and nothing to warrant further discussion. The judgment and sentence are affirmed.

APPROVED BY THE COURT.