No. 46,723

STATE OF KANSAS, *Appellee*, v. DONALD W. WEYER, *Appellant*.

(504 P. 2d 178)

Opinion filed December 9, 1972.

*Kenneth V. Moses*, of Marysville, argued the cause and was on the brief for the appellant.

*Keith W. Sprouse*, of Marysville, argued the cause, and *Vern Miller*, attorney general, was with him on the brief for the appellee.

The opinion for the court was delivered by

HARMAN, C.: Appellant Donald W. Weyer was convicted by a jury of the offense of murder in the second degree as defined in K. S. A. 1971 Supp. 21-3402. His motion for new trial was overruled, he was sentenced to confinement pursuant to K. S. A. 1971 Supp. 21-4501(*b*) and he now appeals.

Jerome L. Gronquist, aged nineteen, was the victim of the alleged homicide which occurred near Waterville, Kansas, during the early morning hours of November 22, 1970.

The assertions of error necessary to be considered for proper disposition of this appeal require but brief outline of the tragic events revealed at trial.

Appellant Weyer, aged twenty-one, who was married but separated from his wife, had several times sought permission from Gleed Gronquist to go with his seventeen year old daughter Nancy, who was then living on her father's farm near Blue Rapids. This permission was denied. The last time Gleed accompanied his denial by grabbing appellant by the coat and shaking him. When Nancy

Gronquist reached her eighteenth birthday she promptly left the family abode and moved into an apartment in Blue Rapids.

On the evening of November 21, 1970, appellant, his mother and stepfather, and Nancy attended a country western dance at a cafe in Greenleaf. Jerome and Larry Gronquist, sons of Gleed, were at the dance and during its course several times shoved appellant and Nancy, who were dancing together, and also shoved appellant's mother and stepfather. They directed epithets toward their sister Nancy. After further name-calling, threats against appellant and shoving by the Gronquist brothers appellant's mother and stepfather summoned law enforcement officers. First the city marshal came and later the sheriff of Washington county arrived at the scene. After the Gronquist group had been gone from the dance for a while the sheriff told appellant's group they could leave, which they did, departing about 1:00 a. m. Appellant and his stepfather each had a pistol which they had left in the glove compartment of their vehicle during the dance. Appellant evidently was in the habit of carrying a pistol. Upon commencing the return trip appellant removed the pistols from the glove compartment, gave his stepfather the one owned by him and placed his own pistol on the dashboard. Nancy was seated in the front seat beside appellant who drove, and appellant's mother and stepfather sat in the rear.

Meanwhile Larry had driven back to the Gronquist farm home and about midnight awakened his father Gleed and informed him of Nancy's presence at the dance with appellant. Larry and his father in one car and Jerome and a friend in another car then proceeded toward Greenleaf in order to intercept appellant en route to return Nancy to Blue Rapids. This interception occurred in the town of Waterville, where the two Gronquist vehicles turned around in pursuit of the vehicle driven eastward by appellant. Just outside Waterville Jerome passed appellant, slammed on his brakes and stopped his vehicle immediately in front of that driven by appellant. At the same time Larry Gronquist drove his vehicle up closely behind appellant's car.

Jerome approached appellant's vehicle from the front while Larry and his father, each on a different side, approached it from the rear. From this point on, as revealed by a fragmented record, the testimony differed as to just what occurred. On behalf of the prosecution evidence was received from which it could fairly be said that the second of six shots fired from appellant's pistol during the en-

suing melee was the one which ended Jerome's life, being one fired by appellant at a time when Jerome was about five feet away from appellant's automobile. At some point in the affray Larry secured appellant's pistol and threw it across the road.

Appellant and his mother testified for the defense. Appellant's version was that he first fired two warning shots through the open window of his vehicle, the first toward the rear where Larry was still sitting in his car and the second for Jerome's benefit—aimed between him and the vehicle he had just left; appellant told Larry to stop Jerome; the Gronquists rushed him and appellant then commenced struggling with them during which time other shots were fired from the gun, three or four or maybe more, he couldn't be sure how many; after the warning shots Jerome first rushed him, threatening him and coming in through the right car window; Jerome's head, arms and upper body were inside the car as he struggled for appellant's gun; someone grabbed appellant's neck and nearly tore his head off and he was knocked down in the seat; he sustained a bullet wound in the leg; thereafter he saw Jerome lying in the road and he then drove off toward Blue Rapids. Appellant denied shooting Jerome or that he had any intention of shooting him when he fired the warning shot.

Appellant's mother testified that after they stopped on the highway near Waterville Larry and Jerome approached appellant's car on the driver's side. She saw appellant fire one shot to the rear and she heard the second shot; after the second shot Jerome came on into appellant's car from his waist up. Larry had his arm inside the car as far as he could get it; the Gronquists were fighting for appellant's gun; Gleed grabbed appellant by the neck and pulled him down in the seat; other shots were fired, one of which struck her in the finger and the knee while she was struggling with Gleed; the third shot went through the roof of the car and the fourth hit Larry in the leg as he "hollered"; she saw appellant's hands after the fourth shot sounded and they were empty. The gun possessed by appellant's stepfather was never fired.

Appellant first specifies as error the trial court's failure to instruct the jury as to the lesser included offense of involuntary manslaughter.

By way of background it may be stated that at trial up through rendition of the verdict appellant was represented by court-appointed counsel, Mr. John R. Elmborg. Evidently at some time

after his motion for new trial had been filed and overruled but prior to sentencing appellant became dissatisfied with Mr. Elmborg and he was permitted to withdraw, present counsel was appointed and appellant was sentenced. The record of trial reveals the following colloquy concerning an instruction on involuntary manslaughter:

"MR. ELMBORG: I would like to propose that an instruction be given to the offense of involuntary manslaughter, your Honor.

"THE COURT: Involuntary manslaughter is defined by our new code and provides it is the unlawful killing of a human being without malice, which is done unintentionally in the commission of an unlawful act not amounting to a felony or in the commission of an unlawful act in an unlawful or wanton manner. The general rule as to instructions, if I understand the rule properly, is that the defendant in a criminal case is entitled to an instruction on any theory or defense which is supported by any substantive evidence regardless of how weak this evidence might be. Mr. Sprouse, do you have any feeling about this?

"MR. SPROUSE: Your Honor, the State would have no objection to the Court including such an instruction.

"MR. ELMBORG: (Interrupting) Your Honor, I think this is a point that I would like to discuss with my client before making the decision as to whether or not this should be requested.

"THE COURT: Very well, I can get this case for you and you might want to read it. We'll go off the record if you want to.

"(Whereupon there is a discussion had off the record.)

"MR. ELMBORG: Your Honor, I have discussed the question of whether or not to request an instruction on involuntary manslaughter with my client, at some length, and I think I have thoroughly advised him of the significance of the decision involved in deciding whether or not to request such an instruction. I think he is aware of the effect of this and it is my client's feeling that he does not want an instruction on involuntary manslaughter.

"MR. ELMBORG: May I state for the record in capsule form what I have told my client in this regard, your Honor. I have informed him that there is evidence in the record to support a finding of involuntary manslaughter, that this would be supported by testimony to the effect that he did indeed kill Jerome Gronquist, although unintentionally and without any malice. I have informed him of the maximum punishment that may be inflicted for the commission of such an offense and I have also informed him that if the jury is not instructed respecting involuntary manslaughter that it may not find him guilty of involuntary manslaughter, but that it may find him guilty only of second degree murder or voluntary manslaughter, each of which is an intentional killing, that it may acquit him on the basis of self defense, but, more particularly, that it may not find him guilty of any offense. If it finds that his actions—that he did in fact kill Jerome Gronquist, and the jury further finds that this was unintentional, he must be acquitted.

"THE COURT: Very well, and he understands the punishments for murder second and voluntary manslaughter?

"Mr. Elmborg: They have been explained to him, do you understand them Donald?

"Defendant Weyer: Yes, sir.

"The Court: And you also understand what Mr. Elmborg just said concerning this particular instruction or lack of the instruction in this case?

"Defendant Weyer: Yes, sir.

"The Court: Very well, that being the case then, gentlemen, you have both had an opportunity to review the proposed instructions and we have now numbered these instructions from one through twenty-four, do either of you have any proposed instructions or suggestions as to alterations of the instructions as they exist at this time?

"Mr. Sprouse: The State is satisfied with the instructions as they are, your Honor.

"Mr. Elmborg: The defense is satisfied with the instructions as proposed."

The trial court instructed the jury on murder in the second degree and upon voluntary manslaughter. As indicated the jury found appellant guilty of the former. No instructions as to involuntary manslaughter were given.

Appellee asserts in support of the trial court's action that appellant knowingly requested that no instruction on involuntary manslaughter be given and, further, certain rulings by this court to the effect that when a defendant has been charged with and convicted of murder under evidence supporting that charge, the correctness of instructions relating to manslaughter becomes immaterial. Respecting this line of authority we stated in *State v. Metcalf,* 203 Kan. 63, 452 P. 2d 842, as follows:

". . . [T]he rule has been well established that when a defendant has been charged with and convicted of murder in the first degree, the correctness of instructions relating to manslaughter becomes immaterial. This rule was perhaps most simply stated and explained in *State v. Kelly,* 131 Kan. 357, 291 Pac. 945, by the following quotation from *State v. McCarty,* 54 Kan. 52, 36 Pac. 338: "' '. . . where the jury under proper instructions have found a defendant guilty of every element of the superior offense, erroneous instructions or a total failure to instruct with reference to an offense inferior in degree and including less criminality cannot, logically, be said to have influenced the jury. The failure of the court can only be said to be prejudicial to the defendant on the theory that the jury failed to fully comprehend the definition of the superior degree, or misconstrued and misapplied the law to the facts. To indulge in such presumptions, even though we know that mistakes are made by juries and courts alike, is to overturn the whole theory of the administration of justice. (p. 58.)"' (p. 364.)

"See, also, cases cited in *State v. Spencer,* 186 Kan. 298, 304, 349 P. 2d 920)." (p. 67.)

However, it must be acknowledged the foregoing principle has

not always been applied. Several examples could be cited but a most recent one, respecting an alleged homicide occurring in 1969, is *State v. Roberson*, 210 Kan. 209, 499 P. 2d 1137. There the defendant was convicted of second degree murder. The trial court denied his request for an instruction on first degree manslaughter. In ordering new trial this court stated:

". . . [W]here, in a criminal prosecution, the evidence is such as to support a finding of guilty of an offense lesser than but included within the more serious offense on which the accused is being tried, the trial court should instruct the jury as to the lesser included charge." (p. 211.)

Cited in support of the foregoing as related to homicides was our holding in *State v. Fouts*, 169 Kan. 686, Syl. ¶ 3, 221 P. 2d 841.

This court has also been confronted with situations in which it was apparent the accused in a homicide was quite content not to have instructions given as to lesser included offenses, preferring instead to gamble on the outcome and "go for broke" on an all or nothing basis; that is, either conviction of the most serious crime charged or complete exoneration of any offense whatsoever. Typical of this strategy is that revealed in *State v. Post*, 139 Kan. 345, 30 P. 2d 1089, wherein this court commented:

"According to defendant's contention the necessity for instructions relating to lesser offenses was patent and not latent . . .; and the requirement of substantial evidence tending to prove guilt of a lesser offense involved in the main charge . . . was satisfied. If this be true, the question arises, why did defendant's counsel omit from the studied request for instructions, instructions on the subject of manslaughter, and so protect defendant from conviction of murder? The court is perfectly familiar with the practice, and the answer is simple and obvious.

"Defendant was a grievously wronged husband. His victim was his wife's would-be seducer. Experience teaches there was strong probability a sympathetic jury could be induced to acquit, rather than convict of murder. If given the opportunity the jury would certainly convict of a lesser offense, entailing comparatively light punishment. If the jury should convict of murder, error in failing to give proper instructions might be urged in an appeal to this court.

"At the trial of a case of this kind, counsel for defendant must decide whether he will request instructions relating to manslaughter, just as he must decide whether he will place his client on the witness stand. Having decided not to make the request, he has waived instructions on manslaughter, and must abide the result. This is familiar law in this state. However, to prevent a miscarriage of justice, the court will examine the proceedings to see if the verdict of guilty of the greater offense was based on satisfying evidence, and was returned under proper instructions relating to that offense." (p. 351.)

Intriguing as this may be, we think the answer to the problem

now comes from a new provision in our recently enacted criminal code. K. S. A. 1971 Supp. 21-3107 (3), which became effective July 1, 1970, provides:

"In cases where the crime charged may include some lesser crime it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced, *even though such instructions have not been requested or have been objected to.*" (Emphasis supplied.)

Plain, unambiguous language is used in this statute and the meaning is clear. No longer is the choice of giving instructions in a situation described therein left to counsel or to the accused, although their views are, of course, to be considered. The statute explicitly places on the trial judge the duty of giving whatever instructions are appropriate upon his analysis of the law and the evidence, and this despite the requests or even the objections of the parties. The statute does no more than recognize a public interest in having a verdict determined in accord with the facts developed at trial. No longer are the choices of the jury to be limited to those agreed upon by the adversaries as a matter of gamesmanship. The statute is specific in nature and, where it is applicable, must control over the general provision contained in K. S. A. 1971 Supp. 22-3414 (3) that no party may assign as error the giving or failure to give an instruction unless he objects thereto.

Another consequence of the enactment of 21-3107 (3) is that the principle referred to in *State v. Metcalf,* supra, no longer remains valid.

K. S. A. 1971 Supp. 21-3404 defines involuntary manslaughter. The elements of this offense basically are (1) That the killing was done unintentionally, and (2) that is was done during commission of an unlawful act not amounting to a felony or during commission of a lawful act in an unlawful or wanton manner. Appellant testified he did not intentionally kill Jerome and at the least the evidence was disputed as to just when and under what circumstances the lethal shot was fired. Without laboring the matter we think the record reveals sufficient evidence on behalf of appellant to warrant an instruction on involuntary manslaughter. Hence we hold the trial court erred in not instructing thereon, for which new trial must be ordered.

Appellant challenges his conviction in other respects but in view of the conclusion just reached only a few of them need be noticed.

He complains the trial court failed to instruct the jury how it should consider an incriminating pretrial statement made by him to a K. B. I. agent. The trial court gave only general instructions as to how the jury should weight the evidence and determine disputed factual issues. Appellant's failure to request a more specific instruction on the statement is one which properly falls within the ambit of K. S. A. 1971 Supp. 22-3414 (3), hereinbefore referred to.

Appellant has also challenged the propriety of the court's action in instructing on self-defense. He asserts such an instruction should not have been given and further complains of the language used in that given, particularly as to the prefatory language in No. 17 to the effect that he claimed he shot the deceased in self-defense. Here again no trial objection was lodged but, treating the issue now on its merits, the trial court's action was not improper. Upon *voir dire* examination and in his opening statement to the jury appellant's counsel asserted the issue of self-defense. Evidence adduced in behalf of appellant, if believed by the jury, would have supported such a defense. Without faulting in anywise the instruction given by the trial court, we would point to the objective handling of this special defense set forth in PIK § 54.17, *et seq., Criminal*, which closely dovetails with our present statutes on the matter (K. S. A. 1971 Supp. 21-3211, *et seq.*) and is appropriate where the evidence admits of more than one defense to the most serious offense charged.

Other matters urged upon this appeal, including those raised by way of postconviction proceedings authorized by the trial court because of the withdrawal of appellant's trial counsel prior to sentencing, have either become moot or are of such nature as not to warrant present consideration.

The judgment is reversed with directions to grant a new trial.

APPROVED BY THE COURT.