No. 47,686

State of Kansas, *Appellee*, v. Moore Childers, *Appellant*.

(536 P. 2d 1349)

Opinion filed June 14, 1975.

*Jack D. Sage,* of Hershberger, Patterson & Jones, of Wichita, argued the cause, and was on the brief for the appellant.

*Stephen M. Joseph,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Keith Sanborn,* district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

Schroeder, J.: This is an appeal by Moore Childers (defendant-appellant) from a jury verdict finding him guilty of second degree murder. The facts may be stated as follows:

On July 21, 1973, and previous thereto, James C. Frost resided with his wife, their three-month-old baby, and Douglas J. Hanley, Mrs. Frost's five-year-old child by a prior marriage, at 2727 North Green, Wichita, Kansas. The house is located on the west side of North Green and faces east. The residence situated immediately to the north of the Frost home belonged to the appellant, who lived in that home with his wife.

After the Frosts had completed their evening meal on July 21, 1973, Mr. and Mrs. Merle Leon Horn, Sr. (Mrs. Frost's sister and brother-in-law), and their five-year-old son, Merle, Jr., visited the Frost's home. Frost prepared drinks for everyone including himself; however, without drinking it, Frost left his house and walked a couple of houses south on the same block to visit a friend. A short time later, Mrs. Frost began to wonder where her husband had

gone and she inquired about the neighborhood until she located him. Frost was in the process of helping a neighbor clean some fish and he told Mrs. Frost to go on home, that he would return soon.

During the evening Emory A. Farris, a thirteen-year-old boy who lived at 2726 North Green (directly across the street from the Frost's house), had been listening to a car radio in front of the appellant's house and playing in the yard. Apparently during the time Frost was away from home, the appellant had told Farris to keep Doug Hanley and Merle Horn, Jr., from running across his yard because it aroused the dogs and caused them to bark while the appellant was trying to sleep.

When Frost returned home from visiting his neighbor and cleaning fish, Farris stopped him and told him what the appellant had said, and also that the appellant had been cussing at Doug and Merle. Frost replied that he would take care of it and started walking across the appellant's yard in the direction of the front door. Farris did not accompany Frost but nevertheless witnessed the subsequent events.

According to Farris, Frost walked a few feet past a window located in the southeast corner of the appellant's house (which was the appellant's bedroom), when the appellant said something to Frost through the window. Farris could not understand the words but he recognized the appellant's voice. Frost then walked back to the window and talked with the appellant. According to Farris, Frost asked the appellant to quit cussing Doug and Merle, and the appellant replied that he had given the children some candy. Frost then stated he appreciated that but he would like for the appellant not to cuss the children any more. Farris also testified that the appellant stated during his conversation with Frost that if the children did not stay out of his yard he "would blow their asses off."

Frost then walked away from the window in the direction of his own house when the appellant said something further. Thereupon Frost walked back in front of the appellant's window and asked the appellant what he had said. Without any further conversation, the appellant fired a shot while Frost was standing in front of the window. After the first shot Frost started running in a southeasterly direction toward the street. After running a short distance in an upright position Frost stooped over. The appellant continued to shoot as Frost ran. Apparently, Frost was struck by a bullet as he neared the street. Farris counted four shots; after the third one he ran to the Frost's house and knocked on the door. By the time Mrs.

Frost had opened the door and the screen, Frost had run from the appellant's windows around his driveway located just south of the appellant's property to his porch where he fell unconscious and died within a few minutes.

On cross-examination Farris testified that it was dark at the time of the shooting and that Frost did not have anything in his hands when he walked to the appellant's bedroom window.

A pathologist testifying on behalf of the state established that Frost died as a result of a bullet penetrating his lower back, probably while he was in a bent position. A firearms examiner testified that the bullet removed from Frost was fired from the appellant's revolver.

A police detective who arrived on the scene shortly after the shooting to take photographs, testified that one of the slippers Frost had been wearing was found in the south part of the appellant's front yard and the second slipper was found in Frost's driveway. The detective stated a street light was located on the corner of the yard at 2713 North Green which is the house located south of Frost's residence. The United States Weather Bureau report for the evening of July 21 described the sky as partly cloudy. The witness stated on cross-examination that he arrived on the scene at 10:33 p. m.; that it was dark; and if the appellant had turned over in his bed and shot out the window, he was not sure if the appellant could have seen whom he was shooting at. However on redirect examination the detective agreed that if it had been dark in the appellant's bedroom he would have been able to see out the window in the direction Frost ran to some extent, due to the street light located south of Frost's house.

The appellant was arrested without resistance shortly after officers arrived on the scene. He told the officers his gun was in his bedroom bureau next to his bed. After being duly advised of his rights the appellant made statements to officers on two occasions. These statements were fundamentally consistent with his testimony at the trial; consequently, for the sake of brevity, we will limit our discussion to the appellant's testimony at the trial to present his theory of defense.

The appellant testified he went to bed at approximately 6:30 or 7:00 o'clock p. m. His bedroom was located on the southeast corner of the house and his bed was positioned about one foot from a screened window in the east wall. The appellant was awakened a little later that evening by his dogs barking in the backyard.

The appellant got out of bed and went outside with a flashlight to quiet the dogs. He noticed that Doug Hanley and a visitor were playing near the dogs, thus causing them to bark. The appellant then returned to bed, but when the children continued to make noise he went back outside and gave them candy so they would play elsewhere. Thereafter, the appellant retired once again.

The appellant testified that later in the evening "way after dark" he was awakened when Frost came to the appellant's bedroom window and in an angry manner told the appellant to stop bothering his children. The appellant denied having bothered the children or having cussed at them and told Frost to leave. The appellant stated he then "rolled back over into my bed under my window and started to go back to sleep and almost asleep" when Frost returned to the window. Due to a hedge placed next to the house, the appellant was unable to see whether or not Frost carried anything in his hands. According to the appellant, Frost started arguing all over again about the treatment of the children.

The appellant kept a .38 caliber revolver in a bureau between his bed and the east window. He had acquired the gun to protect his wife and himself from a gang of young people which had been thieving in that section of Wichita and harassing older people.

When Frost returned on the second occasion, the appellant reached into the bureau drawer from his bed and grabbed the revolver, sat up on the bed and shot once through the screen "not shooting at him [Frost] because I couldn't see to well, it was dark, to scare him out of my yard, make him get away, leave me alone." Thereafter, the appellant fired four or five more shots as he saw Frost run in the direction of the street.

The appellant testified that he was afraid Frost was going to hurt him or possibly his wife, who was sleeping in the next room when he returned the second time; that Frost was aggravated and agitated so appellant had a right to shoot because he did not know whether or not Frost had a gun; and Frost was trespassing in such a manner as to entitle the appellant to protect his property.

The appellant's testimony was inconsistent as to whether he realized at the time he was shooting that the man outside the window was Frost, or whether he merely saw the unidentifiable silhouette of a man; however, he testified several times that he was firing into the dark and into the ground but not at any particular person. The following excerpts from the appellant's testimony on direct examination emphasize this point:

"Q. And you just fired through here?

"A. Yes, sir.

"Q. Was you shooting at any person or anything?

"A. No, sir. I was just shooting into the ground.

"Q. Huh?

"A. I was shooting into the ground.

"Q. Just shooting through the screen?

"A. Yes, into the ground.

"Q. And what was your purpose of shooting through the screen?

"A. To scare him away.

"Q. When you—in other words, you didn't know that you were shooting at him?

"A. No, sir.

"Q. When did you first learn that he was shot?

"A. After the police had taken me down to the police station about an hour and a half afterwards. The detective told me that Mr. Frost was dead and I said oh my God, I did not intend to do that, to shoot Mr. Frost. I had no intentions of doing it."

In an effort to contradict the appellant's testimony that he was shooting into the ground, the state introduced photographs of two bullet holes which had been discovered in the house situated across the street from the appellant's house. Apparently, the owner of the house had not noticed them prior to the shooting incident, but no ballistic tests had been conducted to determine whether or not the bullets lodged in the house were shot from the appellant's revolver.

The state's evidence also included a police officer's testimony that Mrs. Childers, the appellant's wife, had stated on the evening of the shooting that she awoke when the shots were fired and yelled to the appellant to find out whether he knew what was happening, and he replied: "I told that nigger to keep out of my yard and to keep away from the window." The officer described Mrs. Childers as very excited and having difficulty in breathing.

The only other testimony produced by the defense was that of his wife and three character witnesses.

At the conclusion of the trial the court submitted the usual instructions to the jury on second degree murder and, as a lesser included offense, voluntary manslaughter. After due deliberation the jury returned a verdict finding the appellant guilty of second degree murder.

In his motion for new trial the appellant submitted as newly discovered evidence that the ground outside the appellant's bedroom window was inclined down toward the street. The argument was if the ground had not been at an incline, and if Frost had not

been running in a crouched position down the incline, he would not have been hit in a vital organ, and that this evidence substantiates the appellant's testimony that he was shooting downward into the ground and not at Frost. The trial court in ruling upon the motion said:

". . . There is an incline at that house, I don't know if that is newly discovered or not; but the point to be made from that to remember, the two bullets that went all the way across the street and over to the other house. The testimony was that they were about four and a half feet off the ground, which would tend to indicate that he was shooting on a level path, and I do agree that the incline probably had something to do with the deceased too, being struck. If he had had flat ground, he might have been able to get away from this man."

The defendant contends, in part, that the district court erred in failing to instruct the jury on the lesser offense of involuntary manslaughter as defined by K. S. A. 21-3404. The record is not clear whether the appellant's attorney requested an instruction on involuntary manslaughter.

The absence of a requested instruction, however, is not controlling. The duty to give instructions as to possible lesser crimes is controlled by K. S. A. 21-3107 (3) which provides:

"In cases where the crime charged may include some lesser crime it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced, even though such instructions have not been requested or have been objected to."

(See, State v. Masqua, 210 Kan. 419, 502 P. 2d 728 [instruction not requested]; and State v. Weyer, 210 Kan. 721, 504 P. 2d 178 [request that instruction not be given].)

In State v. Clark, 214 Kan. 293, 521 P. 2d 298, this court relied upon K. S. A. 21-3107 (3) to reverse a conviction for failure to instruct. There it was said the accused has a right to have his theory of the case presented to the jury under appropriate instructions, where there is support in the evidence therefore, even though the evidence may be weak and not conclusive; that the testimony of the defendant alone, if tending to show a lesser degree of crime, is sufficient to require the court to so instruct. (See also, State v. Boyd, 216 Kan. 373, 532 P. 2d 1064.)

The long standing policy behind the need for instructions was plainly expressed in The State v. Buffington, 66 Kan. 706, 72 Pac. 213:

"The defendant in a criminal prosecution has a right to have the court instruct the jury in the law applicable to his contention, if it be supported by substantial evidence, however weak, unsatisfactory or inconclusive it may appear to the court. To refuse so to instruct the jury would be to invade its province in the trial of a case. The question is not whether, in the mind of the court, the evidence as a whole excludes the idea that the defendant is guilty of an inferior degree of the offense charged, but whether there is any substantial evidence tending to prove an inferior degree of the offense. If there is, then the question of such degree should be submitted to the jury. The unsupported testimony of the defendant alone, if tending to establish such inferior degree, is sufficient to require the court so to instruct." (pp. 709, 710.)

On jury function see *State v. Long*, 210 Kan. 436, 502 P. 2d 810.

The state presented a strong case to support its theory that the defendant's killing of Frost met the second degree murder requirements of K. S. A. 21-3402. But the defendant's testimony, although partially inconsistent, raises serious questions whether the requisite intent necessary for second degree murder or voluntary manslaughter was present.

K. S. A. 21-3404 sets out the elements of involuntary manslaughter:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner. As used in this section, an 'unlawful act' is any act which is prohibited by a statute of the United States or the state of Kansas or an ordinance of any city within the state which statute or ordinance is enacted for the protection of human life or safety."

Involuntary manslaughter is distinguished from voluntary manslaughter by the lack of intent to kill. (See, *State v. Wilson*, 215 Kan. 437, 524 P. 2d 224.) Obviously the existence or nonexistence of this criminal intent is crucial to the appellant's case.

The appellee erroneously argues involuntary manslaughter is an *act* done unintentionally—not a *killing* done unintentionally. Involuntary manslaughter has been defined by this court as a *killing* done unintentionally. (*State v. Weyer*, supra.)

In our opinion the record discloses sufficient evidence supporting the appellant's theory that the killing was done unintentionally to require a jury instruction on involuntary manslaughter.

The appellant testified the incident took place way after dark. This was corroborated by Emory Farris, the thirteen-year-old witness and by the laboratory investigator Harold Foster, who arrived shortly after the shooting. It is possible, even with the street light, that the appellant did not see clearly outside the house.

The appellant in his testimony insisted he was just shooting into the ground; that he was only trying to scare Frost; that he had no intention of killing Frost. He repeatedly testified to this effect, explaining the event was just an accident; that it was a mistake.

Beyond the appellant's own testimony, counsel for appellant places great reliance on an incline which is downward from the house toward the street. Counsel implies his client's intention to fire into the ground, where the ground inclines downward from the house, resulted in a bullet traveling parallel to the ground. The prosecutor, while not accepting completely this contention, did agree that the incline probably had something to do with the deceased being struck.

The situation is similar to that facing this court in *State v. Weyer,* supra. There the prosecution submitted evidence from which it could fairly be said that the second of six shots fired from Weyer's pistol during the melee was the one ending the victim's life. Weyer testified the second shot was a warning shot for the victim's benefit —aimed between the victim and the victim's vehicle. Weyer denied that he had any intention of shooting the victim when he fired the warning shot.

In *Weyer,* a second degree murder case, the instruction on involuntary manslaughter was rejected by Weyer's counsel. Here in a second degree murder case the instruction on involuntary manslaughter may not have been requested. The difference is immaterial. Under K. S. A. 21-3107 (3) the circumstances and the evidence here presented requires the giving of the instruction on involuntary manslaughter, a lesser included offense.

On this state of the record failure to give an involuntary manslaughter instruction was reversible error.

The appellant further urges that the trial court committed prejudicial error in allowing the state to introduce gruesome color photographic slides of the deceased's body taken during the autopsy. This court recently discussed a similar issue in *State v. Boyd,* supra. (See Anno. Evidence, Photograph of Corpse, 73 A. L. R. 2d, § 8, p. 787.) We think it was error to admit these gruesome color photographic slides. In view of our reversal further discussion is not warranted.

The judgment of the lower court is reversed with directions to grant a new trial.

FROMME, J., not participating.